## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** : | : |
| : | **Civil Action No.  19-cv-5957** |
| **Plaintiff,** : | |
| : | |
| **v.** : | **Jury Trial Demanded** |
| : | |
| **NORTHRIDGE HOLDINGS, LTD.,** : | |
| **SOUTHRIDGE HOLDINGS, LTD.,** : | |
| **EASTRIDGE HOLDINGS, LTD.,** : | |
| **BROOKSTONE INVESTMENT** : | |
| **GROUP, LTD., GUARDIAN** : | |
| **INVESTMENT GROUP, LTD.,** : | |
| **UNITY INVESTMENT GROUP, LTD.,** : | |
| **AMBERWOOD HOLDINGS L.P., and** : | |
| **GLENN C. MUELLER,** : | |
| : | |
| **Defendants.** : | |
| : | |

## <u>COMPLAINT</u>

Plaintiff U.S. Securities and Exchange Commission ("SEC") alleges the following

against defendants Northridge Holdings, Ltd. ("Northridge"), Southridge Holdings, Ltd.

("Southridge"), Eastridge Holdings, Ltd. ("Eastridge"), Brookstone Investment Group, Ltd.

("Brookstone"), Guardian Investment Group, Ltd. ("Guardian"), Unity Investment Group, Ltd.

("Unity"), Amberwood Holdings L.P. ("Amberwood"), and Glenn C. Mueller ("Mueller"):

## <u>NATURE OF THE ACTION</u>

1.     Since at least May 2014, Illinois property developer Glenn Mueller has conducted

a fraudulent, unregistered securities offering through Northridge and affiliated entities he owns

and controls.  In the last five years, Defendants fraudulently offered and sold promissory notes

totaling at least $41.6 million, in unregistered transactions, to over 300 investors across 32 states, many of whom were unsophisticated and/or unaccredited and of retirement age.

2.     Mueller and his company, Northridge, purported to generate returns for investors through the strategic acquisition of underperforming real estate, primarily large apartment complexes and other multi-family properties located in Illinois.  On Northridge's website, in its marketing materials and through direct communications Mueller had with investors, Mueller and Northridge represented that investors' funds would be used to purchase and renovate such properties, resulting in profits derived from higher occupancies and rents, and/or the re-sale of properties or individual units.

3.     But while Northridge portrayed itself as an opportunistic fix-and-flip investor, in reality it was (and is) a landlord struggling to make ends meet.  Most of Northridge's properties were purchased at least twelve years ago.  Its last purchase was a small office building in 2012 (for $535,000).  Northridge has sold little of the real estate portfolio it has managed since and, moreover, consistently failed to generate sufficient cash flow from the properties to cover its expenses – despite proclaiming to have "made a science out of managing properties efficiently."

4.     Thus, for the past five years or more, Northridge has been propped up by a precarious foundation of new investor money.  In Ponzi fashion, and contrary to the representations to investors, Defendants used significant amounts of funds raised from new investors to pay promised distributions to earlier investors, as well as to pay "finders" who referred investors to Northridge, to trade stocks and options, and to make purported loans to members of Mueller's family.

5.     Mueller perpetuated this fraudulent scheme, in substantial part, through the continuous offer and sale of promissory notes, with terms ranging from one to eight years and

annual interest rates of 3% to 12%.  To entice investors to part with retirement and other needed

savings, Mueller and Northridge misleadingly marketed certain promissory notes as "CDs," even

though they were not insured or otherwise protected in a manner comparable to a bank-issued

certificate of deposit.

6.    While Mueller promoted the investments under the Northridge moniker, he

typically issued investors unsecured notes in the name of shell companies – Defendants

Southridge, Eastridge, Brookstone, Guardian, and Unity – which had no meaningful assets.

Nevertheless, Mueller reassured investors the notes were "backed" by all of Northridge's

underlying properties, falsely suggesting a margin of security that did not actually exist, given

the debt and equity structure of the business.  Indeed, apart from a small percentage (typically

1%), Northridge itself does not own the respective properties, which carry substantial mortgages.

Mueller previously organized separate limited partnerships to hold each property, bestowed 40%

ownership rights in these partnerships to Defendant Amberwood (an entity Mueller holds with

family), and sold the remaining equity interests to outside investors.

7.    According to their records, the entity Defendants collectively owe in excess of

$41 million in total promissory note debt.  Each year between 2014 and 2018, the outstanding

promissory note debt of the Northridge real estate operation grew (on top of mortgage debt of

over $40 million), and internal financial reporting revealed annual net losses and negative net

assets.  Yet all the while, in marketing materials and sales pitches, Mueller and Northridge touted

their purported financial success and portrayed their investment offerings as "safe" and "low-

risk."

8.    Defendants continued to offer and sell promissory notes through at least April

2019.  This lawsuit seeks to stop Defendants' unlawful activities.

3

9.      Through the activities alleged in this Complaint, Defendants violated Sections

5(a), 5(c) and 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77e(a),

(e)(c), and q(a)].  Defendants also violated Section 10(b) of the Securities Exchange Act of 1934

(the "Exchange Act") [15 U.S.C. § 78j(b)], Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a), (c)],

and, in the case of Northridge and Mueller, Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(a),

(c)].

10.     Accordingly, the SEC seeks a judgment from the Court: (a) finding that

Defendants committed the violations alleged herein; (b) permanently enjoining Defendants from

violating or aiding and abetting future violations of these provisions of the federal securities

laws; (c) requiring Defendants to disgorge, jointly and severally, with prejudgment interest, their

ill-gotten gains; and (d) requiring Defendants to pay civil money penalties pursuant to Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15

U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

11.     The SEC brings this action pursuant to authority conferred by Sections 20(b) and

20(d) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)], and Section 21(d) of the Exchange Act

[15 U.S.C. § 78u(d)].

12.     This Court has jurisdiction over this action pursuant to Section 22 of the

Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

13.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and

27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 77aa].

14.     In connection with the conduct alleged in this Complaint, Defendants have

directly or indirectly made use of the means or instrumentalities of transportation or

communication in interstate commerce, the facilities of a national securities exchange, or the mails.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 77aa] because the acts, practices, transactions, and courses of business constituting the underlying securities law violations, occurred in substantial part within this district and because, as set forth below, Defendants all reside in this district.

## DEFENDANTS

16.     **Northridge Holdings, Ltd.** is a North Dakota corporation with its principal place of business in Addison, Illinois.  Since at least 2014, Northridge has solicited investments promising returns generated by the purchase, renovation, management and/or sale of real estate. Mueller controlled Northridge, which is not registered with the SEC in any capacity, and through Northridge sold promissory notes to investors in Illinois and other states.

17.     **Southridge Holdings, Ltd.** is an Illinois corporation with its principal place of business in Addison, Illinois.  Mueller controlled Southridge, which is not registered with the SEC in any capacity, and through Southridge sold promissory notes to investors in Illinois and other states.

18.     **Eastridge Holdings, Ltd.** is an Illinois corporation with its principal place of business in Addison, Illinois.  Mueller controlled Eastridge, which is not registered with the SEC in any capacity, and through Eastridge sold promissory notes to investors outside of Illinois.

19.     **Brookstone Investment Group, Ltd.** is an Illinois corporation with its principal place of business in Addison, Illinois.  Mueller controlled Brookstone, which is not registered

with the SEC in any capacity, and through Brookstone sold promissory notes to investors in

Illinois and other states.

20.     **Guardian Investment Group, Ltd.** is an Illinois corporation with its principal

place of business in Addison, Illinois.  Mueller controlled Guardian, which is not registered with

the SEC in any capacity, and through Guardian sold promissory notes to investors in Illinois and

other states.

21.     **Unity Investment Group I, Ltd.** is an Illinois corporation with its principal place

of business in Addison, Illinois.  Mueller controlled Unity, which is not registered with the SEC

in any capacity, and through Unity sold promissory notes to investors in Illinois and other states.

22.     **Amberwood Holdings L.P.** is an Illinois limited partnership with its principal

place of business in Addison, Illinois.  Northridge is the general partner of Amberwood.  Mueller

and two members of his family are the limited partners of Amberwood, with Mueller owing

forty-four percent (44%).  Amberwood sold promissory notes to investors in Illinois and at least

one other state.  Amberwood is not registered with the SEC in any capacity.

23.     **Glenn C. Mueller**, age 72, is a resident of West Chicago, Illinois.  Mueller is the

President and sole owner of Northridge, Southridge, Eastridge, Brookstone, Guardian and Unity.

Mueller controlled these entities and Amberwood, including their operations, transactions to and

from their bank accounts, and the content of representations made to investors in these entities.

## RELATED ENTITIES

24.     To purchase and/or hold different real estate properties, or interests in those

properties, Northridge and Mueller organized different Illinois limited partnerships (of which

Northridge is the general partner), as well as associated trusts and other entities, which directly

or indirectly received proceeds from Defendants' offer and sale of promissory notes, including

6

the following:  Timber Lake Apartments LLC, Arbor Limited Partnership, Kings Circle Limited Partnership, Hawthorne Limited Partnership, 561 Deere Park Circle Limited Partnership, 610 Lincoln Limited Partnership, 610 Lincoln Trust #13741, 106 Surrey Limited Partnership, 106 Surrey Trust #14029, 5097 Elston Limited Partnership, 5528 Hyde Park Limited Partnership, 149 Mason Limited Partnership, 149 Mason Trust #12655, 139 Austin Limited Partnership, Azlan Group, LLC, and Cornerstone II Limited Partnership.

25.     Mueller also formed other entities to provide services to Northridge-managed properties, including Town Square Management I Ltd. and Mueller Painting & Decorating Limited Partnership, which directly or indirectly received proceeds from Defendants' offer and sale of promissory notes.  Mueller owns and controls these entities, directly or indirectly through Northridge.

26.     Mueller further owns entities (with one or more family members) whose activities are unrelated to the Northridge-managed properties, but nonetheless directly or indirectly received proceeds from Defendants' offer and sale of promissory notes, including Paragon Group Limited Partnership, Ridgeview Group I Limited Partnership, and Willow Creek Ventures Limited Partnership.  Northridge is the general partner of both Paragon Group Limited Partnership and Ridgeview Group I Limited Partnership.

## STATEMENT OF FACTS

### A.     Northridge's Business and Management

27.     Northridge is a privately owned real estate business based in Illinois.  The stated objective of the business, according to its marketing materials, "is to purchase undervalued or mismanaged, income producing apartment buildings through leveraged financing; then increase their value by improving their appearance, increasing income and reducing expenses."

28.     The investor section of the Northridge website, until it was recently changed, proclaimed:  "Every Investor is looking for a safe investment with the highest potential for success.  At Northridge Holdings, we've consistently delivered just such a mix for over 47 years despite market swings and economic downturns."

29.     The brochure distributed to potential investors, which has remained largely unchanged for the past five years (or more), includes an explanation of "How Northridge Works," stating:

> We start by locating the right rental property, one whose value is poised for significant increase.  After making the purchase and forming a limited partnership of investors, we either convert the complex to condominiums and sell off the units individually or continue operation as a rental property, making key improvements to lower expenses and raise monthly income.  When the property value reaches an optimal level, we sell it for cash ….

30.     The same brochure also includes an explanation of "Why Northridge Works," citing to "nearly 50 years" of real estate business experience, during which Northridge purportedly "made a science out of managing properties efficiently" and established a "track record of credible money management."  "Integrity" is described as "the linch-pin" of the business.

31.     As sole owner and President, Mueller manages all aspects of Northridge's business activities, including the purchase, development and financing of real estate projects.

32.     According to Northridge's marketing materials, as of February 2019, it operated 11 different properties, totaling 935 units.  These were purchased for a total of approximately $57 million, using the proceeds of mortgage loans, secured by the properties, plus investor-provided capital.  The largest Northridge-managed property, a 576-unit apartment complex, was purchased in 2007 for $30 million.

33.     Mueller and Northridge organized different entities (referenced above in paragraph 24, hereafter the "Real Estate Entities") to hold the respective properties and sold ownership interests in those entities to outside investors to help finance initial property acquisition and renovation costs.

34.     Northridge has a minimal ownership interest (of around 1%) in each of the Real Estate Entities and, as general partner, is entitled to a fee for the operation and management of the underlying real estate property, typically in an amount equal to 5% of all cash revenue and proceeds of the corresponding partnership (other than proceeds from a sale or refinancing).

35.     Separately, Mueller indirectly owns a significant percentage of the Real Estate Entities through his family's personal investment vehicle, Amberwood.  Under the terms of the relevant subscription and partnership agreements, Amberwood was granted 40% ownership interests in the Real Estate Entities, even though it was not required to contribute any capital for those interests.  Investors in the Real Estate Entities share the remaining 60% of profits or losses, according to their percentages of capital investment.

36.     Although Northridge's marketing materials provide various examples of it buying and selling properties between 1995 and 2006, with turnarounds of one to three years and alleged returns ranging from 50% to 100% or more, Northridge has not purchased a new property since it purchased a small commercial building (20 offices) in 2012 for $535,000.  In the ensuing years, Northridge has sold only two small residential buildings (approximately 56 units combined) and a handful of condominium units.

37.     As Northridge's buy-and-sell model turned into a buy-and-hold reality, it became increasingly dependent on new investor funds to offset negative cash flows and cover its expenses.

9

**B.      Defendants' Continuous, Unregistered Promissory Note Offering**

38.      Since at least May 2014, Defendants engaged in a continuous offering of promissory note investments.

39.      They offered so-called "real estate promissory notes," which were to pay annual interest of 3% until the funds were invested in a specific property (through the purchase of an interest in a real estate limited partnership).

40.      They simultaneously offered promissory notes described by Mueller and Northridge as "CDs" or "CD loans."  These notes typically had terms ranging from one year to five years or more and annual interest rates ranging from 3% to 6%, depending on whether investors agreed to a shorter or longer-term note.  Certain noteholders who invested larger amounts of money or agreed to longer terms received interest rates as high as 12%.

41.      The promissory notes were typically structured for interest to accrue and be added to the balance of the note upon maturity.  Defendants agreed to pay interest periodically to certain investors.

42.      Defendants offered the notes to the public on an ongoing basis, including through newsletters dating back to July 2010, which until recently were available on Northridge's website.  For example, a November 2011 Northridge newsletter (available on Northridge's website as of February 15, 2019) included the following offer:

> **Cash and IRA accounts**
>
> We are accepting funds for future real estate projects that bear interest until you become a partner in a property that is purchased. We also have alternative CD accounts paying 3-6% interest depending on the term.  This is approximately 5 to 6 times the amount banks are currently paying in interest on CDs.  This is available for cash, traditional and Roth IRAs.

43.     A June 2012 newsletter (available on the Northridge website as of February 15, 2019) similarly stated:  "We are currently excepting [sic] funds for future real estate projects that will bear interest until invested in real estate.  As an alternative, we offer CD accounts paying 3-6% for a term varying from 1-8 years.  Both opportunities are available for cash, traditional and Roth IRAs."

44.     In addition to the newsletters and website, Northridge utilized other promotional methods to solicit investments in the notes, including correspondence, phone calls and in-person meetings with potential investors, many of whom were introduced to Northridge by "finders" located in various states, including Illinois, Louisiana, Massachusetts, New Hampshire, and New Jersey.  The marketing materials Northridge provided to investors, either directly or through finders, included a schedule of interest rates for the dual "Real Estate Promissory Note" and "CD Loan Promissory Note" investment offering.

45.     Initially, Northridge and/or Amberwood paid commissions to finders based on the amount and duration of promissory note investments obtained from successful referrals. Between 2016 and 2017, Northridge began executing "consulting" agreements with the finders pursuant to which their compensation was changed to a monthly flat-fee arrangement, subject to renewal approximately every four months.  Mueller signed these agreements on behalf of Northridge.

46.     Although the promissory notes were promoted as an investment in Northridge's real estate business, the vast majority of notes were issued by various shell entities owned by Mueller, namely Southridge, Eastridge, Brookstone, Guardian, and Unity.  Mueller ostensibly utilized these shell companies –which had few if any assets and mounting liabilities due to the promissory note offerings – to raise money from different subsets of investors.  Additional

11

promissory notes were issued by Northridge itself and also Amberwood.  Mueller signed the

promissory notes on behalf of each entity Defendant.

47.     The entity Defendants essentially operated as one common enterprise raising

funds for the benefit of Northridge.  At all relevant times, Mueller controlled the movement of

money between and among the Defendants and the Real Estate Entities, each of which had its

own bank account.  At Mueller's direction, money raised from the issuance of promissory notes

by the entity Defendants was transferred between their bank accounts and otherwise commingled

to meet the most immediate expense needs of the Northridge business.

48.     From at least May 2014 through April 2019, Defendants offered and sold at least

$41.6 million in promissory notes to 319 investors across 32 states, many of whom were

unsophisticated and/or unaccredited and of retirement age.  Of this amount, approximately $23

million was raised from new investments, with the remainder consisting of prior investments that

were rolled over into new notes.  None of the securities or securities offerings was registered

with the SEC.

**C.     Mueller Gained Investors' Trust Through Personal Appeals Based on Shared Religious Beliefs.**

49.     In promoting their investment offerings, Mueller and Northridge sought to appeal

to the charitable and religious interests of investors by, among other things, highlighting the

presence of a church-sponsored resource center at Northridge's largest apartment complex and

touting the programs and services provided by this and another area church.  This helped Mueller

to gain investors' trust and secure investments from those with shared beliefs.

50.     For example, Northridge's two-page investor newsletter for "Fall 2016" described

various activities of the two churches, as well as a "soccer ministry," and concluded with the

following remark:  "Your investment in Northridge is growing financially and I believe God

12

rewards those who help others in need. You are benefitting from both areas. Thank you for working together with us to make this a good investment."

51.     Similarly, the Northridge brochure includes a page entitled "What We Work For: Investing in People and Communities" that not only suggests Northridge "helps kids everyday through an on-site resource center," but also describes Northridge's pride in having investors who "reinvest[] in the lives of others – from supporting orphanages in Romania to funding Christian schools and youth camps in the U.S." and states that supporting "their success pays dividends far beyond what an accountant could measure."

52.     Mueller also sought to leverage religious sentiments in direct communications with investors.

**D.      Mueller and Northridge Told Investors Their Funds Would Be Used to Purchase and Improve Real Estate Properties Which "Backed" Their Investments and Minimized Risk.**

53.     In Northridge's marketing materials, and in Mueller's direct communications with investors, Northridge and Mueller represented that investors' funds would be used to buy and renovate real estate assets.

54.     Dating back to its July 2010 newsletter (which referenced the "CD" promissory notes and was available on the Northridge website as of February 15, 2019), Northridge represented that investor funds "were being put to good use" and were "necessary to purchase, maintain, and improve the properties." Mueller repeated this same basic message to individual investors time and again over the years during in-person and telephonic meetings.

55.     Northridge and Mueller further represented to certain investors that the Northridge-managed properties collectively served as collateral for repayment of the promissory notes, bolstering the notion the notes were as safe as a bank "CD."

56.     For example, in a June 12, 2017 letter to a potential investor in Massachusetts,

Mueller stated:

> We also take in funds that are used to upgrade the apartments.
> This allows for higher rents and increases the property value.  This
> CD alternative is for a 1-5 year term and yields 3%-6% interest
> paid monthly, quarterly, annually or the interest can compound
> annually and be taken out at any time with no penalty.  The loan is
> backed by the equity and cash flow of the properties.  Both the
> owners and the lenders benefit from this arrangement.

(emphasis added)  This individual subsequently entered into a three-year promissory note with

Eastridge for $100,000.

57.     In a July 28, 2014 email to a finder, in which he provided a "written … answer

explaining our use and security for loans," Mueller similarly stated:

> The equity and cash flow of our properties (approximately 1,000
> units) back up the promissory notes.  Instead of tying each loan to
> an individual property, they are secured by any and all of the
> properties and their cash flow, thus giving more protection.  We
> use loans from private parties and entities to upgrade our
> apartments ….   These upgrades allow us to increase the rents,
> lower expenses and have better occupancy, which also increases
> the value of the property.  We are able to pay an interest rate
> higher than lenders could receive from banks and it is still
> advantageous to the property owners.

(emphasis added)

58.     Mueller and Northridge assured investors the properties allegedly "backing" the

notes were sufficiently profitable.

59.     For example, in a January 4, 2017 email to one of Northridge's finders, Mueller

downplayed the risk of the promissory note offerings by touting the purported success of

Northridge's property management, stating:  "We have not seen an increase in risk.  On the

contrary, the cash flow and the increase[d] value of the properties has been increasing the

collateral for the loans." (emphasis added)

60.     In a September 8, 2016 email to another finder, Mueller represented that Northridge's "net loan balances are lower each year and the net [property] values are increasing each year."  Mueller further claimed "there is a large surplus of equity above and beyond all of the loans and that number is increasing each year" and thus "the collateral for the loans continues to grow reducing risk each year."

61.     Mueller made these statements to finders with the expectation the information he conveyed would be passed on to investors.

62.     The newsletters available on Northridge's website also depicted an upward trajectory of sustained financial success:

- Northridge's **Fall 2018 newsletter**, which expressed gratitude "for the trust of our investors and lenders," stated:  "Together we have accomplished our best year yet. Our income and values have increased on every property."

- Northridge's **Fall 2017 newsletter** stated Northridge had "another successful year."

- Northridge's **Fall 2016 newsletter** stated:  "Again, this year has been strong and each year continues to be better than the year before.  Our rents and property and property evaluations have grown to the highest lever that we have ever had, while maintaining a very high occupancy level."

- Northridge's **Fall 2015 newsletter** stated:  "Every location is performing very well."

- Northridge's **June 2014 newsletter** stated:  "All of our properties are on track to have a significant increase in cash flow and value for 2014."

**E.**     **Mueller and Northridge Misled Noteholders About the Risks and Nature of Their Investments and Were Operating a Ponzi Scheme.**

63.     In connection with the promissory note offerings, Mueller and Northridge made numerous material misrepresentations and omissions regarding, among other things, the success of Northridge's business, the safety and security of the investments, the source of purported investment returns, and the use of investor funds.

64.     Contrary to the representations of Northridge and Mueller, from at least May 2014 through 2018, Northridge's real estate business was not profitable, and it did not generate enough revenues from the properties to cover its business expenses and pay promised interest to noteholders, much less to repay the principal of maturing notes.  According to Northridge's internal financial statements, it had net losses and negative net assets each year during this time period.

65.     In 2017, for example, Northridge's total cash expenditures exceeded its cash inflows (when including the other Defendant entities and the affiliated Real Estate Entities) by approximately $1.8 million.

66.     With the properties failing to generate sufficient income, through rents or sales, Defendants routinely used new investor funds to pay interest and principal to earlier investors. Indeed, during the relevant period, the core functions of Northridge's limited staff included interfacing with finders and prospective investors, in-taking "new investor forms" and related documentation, moving money around the various bank accounts of the Mueller-controlled entities, and issuing a multitude of checks for Ponzi payments to investors.  Mueller also caused Defendants to use promissory note investors' funds to pay commissions and consulting fees to finders, exceeding $1.8 million combined since 2014.  These payments were typically made by Amberwood, with funds received from the other entity Defendants.

67. Deferring repayment was essential to the scheme. The promissory notes were structured to automatically renew upon maturity unless certain conditions were met (e.g., written objection from the investor within the preceding ten days). Northridge typically contacted investors in advance of the maturity of their notes to discuss renewal on the same or different terms. Many investors agreed to roll-over their notes into new notes based on Northridge's and Mueller's representations regarding safety and profitability, as well as account statements from Northridge depicting purported gains.

68. Defendants further created the appearance that Northridge was investing funds and generating returns as promised by making periodic distributions to those seeking a fixed income stream. Mueller often diverted investor monies from one entity Defendant to another to fund such payments. The payments lulled investors and induced them to maintain and renew their investments with Northridge, including by rolling-over maturing note balances into new notes.

69. Contrary to the representations to investors, Mueller diverted additional note proceeds away from the flagging real estate operation, including approximately $1.7 million to trade stock and options in accounts he controlled and approximately $647,000 in purported loans to members of his family.

70. As a result of the above, the promissory note investments were far riskier than investors were led to believe.

71. A reasonable investor would have wanted to know that Defendants were relying on the issuance of new promissory notes to make distributions of interest and principal to prior investors.

72.     Mueller and Northridge further misled certain investors to believe the promissory notes were secured or equivalently "backed" by the managed properties, when in fact they were not.  Notably, during the relevant period, Northridge consistently reported unrealized gains to Real Estate Entity investors that, according to their account statements (available by password log-in to the Northridge website), were "based on the actual accumulated annual income and expenses and estimated market valuation" of the properties; yet did not reflect or incorporate any promissory note "expenses," despite Mueller's statements to promissory note investors imputing this debt to the properties.

73.     By March 1, 2019, Mueller and Northridge had notice the SEC was investigating whether they were engaged in unregistered and fraudulent securities offerings.

74.     Subsequently, in March and April 2019, Mueller persuaded two new investors to invest a total of $650,000 in promissory notes (issued by Guardian and Unity) and also convinced two existing investors to roll-over their promissory notes (with Eastridge and Unity).  Northridge used a significant portion of the new investor funds to pay principal and interest to prior investors, to pay finders, legal fees, and a settlement of the lawsuit involving the two properties Northridge sold in 2016.  These uses were not disclosed to the two new investors, nor were they, or the two existing investors who rolled-over notes, told Northridge was under investigation for securities laws violations.

75.     Mueller recently estimated Northridge's real estate properties to have a liquidation value of around $100.4 million.  But, according to Northridge's internal records, the business (including Defendant entities and Real Estate Entities) has liabilities over $113 million.

76.     During the Commission's pre-suit investigation, the Commission subpoenaed Mueller to provide sworn testimony.  In response, Mueller invoked his Fifth Amendment right

18

against self-incrimination and refused to answer any and all questions about the above-described promissory note offerings, including the use of proceeds, the source of payments to investors, the value of the Northridge-managed real estate properties, and whether Northridge has been, and/or is currently, able to make payments due to investors from operating cash flow, without the issuance of additional promissory notes.

### FIRST CLAIM FOR RELIEF
**Violations of Section 5(a) and 5(c) of the Securities Act**
**(Against All Defendants)**

77.     The SEC repeats and incorporates by reference the allegations in paragraphs 1 through 76 above.

78.     By virtue of the conduct alleged herein, Defendants directly or indirectly: (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and (iii) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

79.     As a result, Defendants have violated and, unless enjoined, will continue to violate Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (Against all Defendants)

80.    The SEC repeats and incorporates by reference the allegations in paragraphs 1

through 76 above.

81.    By virtue of the conduct alleged herein, Defendants, directly or indirectly, acting

knowingly or recklessly, in the offer or sale of securities, by the use of means or instruments of

transportation or communication in interstate commerce, or of the mails: (a) have employed or

are employing devices, schemes, or artifices to defraud; (b) have obtained or are obtaining

money or property by means of untrue statements of material fact or omissions to state a material

fact necessary in order to make the statements made, in the light of the circumstances under

which they were made, not misleading; and (c) have engaged or are engaging in transactions,

practices, or courses of business which operate as a fraud or deceit upon purchasers of the

securities.

82.    As a result, Defendants have violated and, unless enjoined, will continue to

violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(a) and (c)
### (Against All Defendants)

83.    The SEC repeats and incorporates by reference the allegations in paragraphs 1

through 76 above.

84.    By virtue of the conduct alleged herein, Defendants, directly or indirectly, acting

knowingly or recklessly, in connection with the purchase or sale of securities, by the use of

means and instrumentalities of interstate commerce, or of the mails, or a facility of a national

securities exchange:  have employed or are employing devices, schemes, or artifices to defraud;

and have engaged or are engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

85.     As a result, Defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (c)].

## FOURTH CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5(b)**
**(Against Northridge and Mueller)**

86.     The SEC repeats and incorporates by reference the allegations in paragraphs 1 through 76 above.

87.     By virtue of the conduct alleged herein, Northridge and Mueller, directly or indirectly, acting knowingly or recklessly, in connection with the purchase or sale of securities, by the use of means and instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, have made or are making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

88.     As a result, Defendants Northridge and Mueller have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## FIFTH CLAIM FOR RELIEF

**Control Person Liability Under Section 20(a) of the Exchange Act**
**(Against Mueller)**

89.     The SEC repeats and incorporates by reference the allegations in paragraphs 1 through 76 above.

90.     By virtue of conduct alleged herein, the entity Defendants (Northridge, Southridge, Eastridge, Brookstone, Guardian, Unity and Amberwood) committed violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

91.     As set forth above, at all relevant times, Mueller directly or indirectly controlled these Defendants and was a culpable participant in their violations of the Exchange Act, including by knowingly or recklessly authorizing and causing Northridge to make the false and misleading representations and omissions described herein and causing Defendants to use investor proceeds in the manner described herein.

92.     Accordingly, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Mueller is jointly and severally liable with, and to the same extent as, the entity Defendants for their violations of the Exchange Act alleged herein.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, the SEC respectfully requests that this Court enter a final judgment:

A.     Permanently restraining and enjoining Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (c)], and, as to Northridge and Mueller, Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

B.     Ordering that, as provided in Federal Rule of Civil Procedure 65(d)(2), the injunctions entered against Defendants also bind the following who receive actual notice of the injunctions by personal service or otherwise: (a) the Defendants' officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with the Defendants or with anyone described in (a);

C.       Ordering Defendants to disgorge their ill-gotten gains derived from the activities

alleged herein, together with prejudgment interest;

D.       Ordering Defendants to pay civil monetary penalties under Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)] and/or Section 21(d)(3) of the Exchange Act 15 [U.S.C.

§ 78u(d)(3)];

E.       Retaining jurisdiction of this action in accordance with the principles of equity

and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all

orders and decrees that may be entered or to entertain any suitable application or motion for

additional relief within the jurisdiction of this Court; and

F.       Awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

The SEC requests a trial by jury.

Respectfully submitted,

**U.S. SECURITIES AND EXCHANGE COMMISSION**

By its attorneys,

/s/ Michael D. Foster
Michael D. Foster (fostermi@sec.gov)
Christine B. Jeon (jeonc@sec.gov)
Timothy J. Stockwell (stockwellt@sec.gov)
175 W. Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Dated: September 5, 2019