## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | Civil Action No. 19-cv-05957 |
| Plaintiff, | ) ) | |
| v. | ) ) | Hon. Ronald A. Guzman |
| NORTHRIDGE HOLDINGS, LTD., ET AL., | ) ) | |
| Defendants. | ) ) ) | Magistrate Judge Susan E. Cox |

## RECEIVER'S OBJECTION TO CLAIM OF AMERICAN REALTY SERVICES INC. (CLAIM NO. 23)

N. Neville Reid, not individually, but solely as the Court-appointed receiver (the "Receiver") for the Estate of Defendant Northridge Holdings, Ltd. and its related entities and affiliates as more particularly set forth in the Receivership Order (as defined herein) (collectively, the "Receivership Defendants," and their assets as more particularly identified therein, the "Receivership Assets," and such estate, the "Receivership Estate," and such administration, the "Receivership"), and pursuant to the powers vested in him by the Order Appointing Receiver entered by the Court on September 12, 2019 as amended [Dkt. No. 22, 108, 215] (the "Receivership Order"), through counsel, hereby files this objection (the "Claim Objection") to the proof of claim filed by American Realty Services Inc. (Claim No. 23)[1] (the "Disputed Claim" and American Realty Services Inc., "ARS"). In support of this Claim Objection, the Receiver states as follows:

## INTRODUCTION

1.     On November 4, 2020, the Court entered the *Order (1) Fixing Claims Bar Date,*

---

[1]     A copy of the Disputed Claim is attached hereto as **Exhibit 1**.

*(2) Approving Claims Procedures and Claims Forms (3) Approving Notices, and (4) Approving the Pooling of Receivership Entities' Assets for Distribution Purposes* (the "Claims Procedures Order") [Dkt. 217]. Under the Claims Procedures Order, the Receiver is permitted to file an objection to a proof of claim. Claims Procedures Order at ¶ 20. The Disputed Claim asserts a $200,000.00 claim against the Estate. As set forth below, however, ARS waived this claim pre-Receivership and otherwise is not legally entitled to assert the Disputed Claim. Therefore, the Receiver requests that this Court enter an order disallowing the Disputed Claim.

## APPLICABLE CLAIMS AND OBJECTIONS THERETO

2.      In summary, the alleged basis of the Disputed Claim is that pre-Receivership: (a) ARS was hired by Northridge Holdings, LTD, pursuant to a listing agreement (attached to the Disputed Claim as Exhibit A, the "Listing Agreement") to act as the real estate broker with respect to the real property located at 561 Deere Park Circle commonly known as the "Bartlett Lakes Property"; (b) the Bartlett Lakes Property went under contract, and the buyer made earnest money deposits to escrow in the amount of $200,000.00; (c) such buyer was unable to close on the Bartlett Lakes Property and forfeited the earnest money (the "Forfeited Deposit"); and (d) under the relevant listing agreement, ARS was entitled to keep the Forfeited Deposit. *See* Ex. 1.

3.      ARS, however, waived its right to the Forfeited Deposit by consenting to the Forfeited Deposit's release from escrow to Northridge Holdings, LTD and never subsequently demanding payment of the same from Northridge Holdings, LTD. Under the Listing Agreement, joint written direction from ARS and Northridge Holdings, LTD was required to release the Forfeited Deposit. *Disputed Claim* at Ex. A §22. As set forth in Mr. Mueller's affidavit (attached as Exhibit D to the Disputed Claim), the Forfeited Deposit was directed to be paid to Northridge Holdings, LTD (which had to be agreed to by ARS) and then Northridge Holdings, LTD "used

2

those funds for its own exclusive purposes." *Disputed Claim* at Ex. D ¶ 10. To the Receiver's knowledge, no pre-Receivership demand was made for the Forfeited Deposit. Clearly, ARS knowingly waived any right to the Forfeited Deposit.[2] Upon information and belief, ARS waived its right to the Forfeited Deposit because, at that time, ARS still had the listing for the Bartlett Lakes Property and believed it would still be in line for a hefty commission.[3] Only after the Receivership, and after ARS was not hired as broker for the Bartlett Lakes Property, did ARS try to go back and assert an interest in the Forfeited Deposit.

4.　Moreover, the Listing Agreement lapsed by its own terms on February 12, 2020 and contains no provision that binds successors. *Disputed Claim* at Ex. A § 2. As a result, the Receivership is not bound to the Listing Agreement and does not have to return the Forfeited Commission.

5.　Finally, the equities here favor disallowing the Disputed Claim. The Receivership did not benefit in any way from the Listing Agreement or ARS's pre-Receivership services with respect to the Bartlett Lakes Property. Moreover, ARS was allowed to continue as broker for another Receivership Property, 610 N. Lincoln (the Chablis Apartments) and received $400,000.00 at closing (approximately 4% of the $10.3 MM sale price). As with Bartlett Lakes, this brokerage rate was well above market and was only paid because the immediate sale of this property (with ARS as broker) was a condition of Mr. Mueller's consent to the Receivership (i.e., the Receiver was not able to engage his own broker and market this property). As a result, ARS has already significantly benefitted from this Receivership. Lastly, Mr. Virgilio, ARS's president,

---

[2]　To the extent ARS disputes waiver, the Receiver will conduct a deposition of Mr. Lou Virgilio, President of ARS pursuant to paragraph 8(M) of the Receivership Order.

[3]　The six percent commission set forth in the Listing Agreement was far above market. When the Receiver engaged a broker to sell the Bartlett Lakes Property, he used a competitive process and engaged a broker at the rate of 1.5%. *See* Dkt. 62.

borrowed funds from the Receivership Defendants pre-petition and has failed to repay such funds. A copy of a promissory note evidencing part of these borrowings is attached hereto as **Exhibit 2**. While the Receiver has attempted to settle this matter, Mr. Virgilio has refused to agree to repay any of these amounts. As a result, litigation is imminent. Mr. Virgilio should not be allowed to profit, through his company, from the Receivership on one hand and not pay his personal debts on the other hand.

## **CONCLUSION**

WHEREFORE, the Receiver respectfully requests that the Court enter an order substantially in the form attached as **Exhibit 3**, sustaining the Claim Objection, disallowing the Disputed Claim, and providing such further relief as the Court deems just and proper.


Dated: September 15, 2022

N. Neville Reid, Receiver

By: _/s/ Ryan T. Schultz_____

N. Neville Reid, Esq.
Ryan T. Schultz, Esq.
L. Brandon Liss, Esq.
Kenneth M. Thomas, Esq.
Fox Swibel Levin & Carroll LLP
200 West Madison, Suite 3000
Chicago, IL 60606
Tel: 312.224.1200
Fax: 312.224.1201
nreid@foxswibel.com
rschultz@foxswibel.com
bliss@foxswibel.com
kthomas@foxswibel.com

## <u>EXHIBIT 1</u>

**Disputed Claim (Claim No. 23)**

| UNITED STATES DISTRICT COURT | |
| --- | --- |
| **UNITED STATES DISTRICT COURT**<br>**NORTHERN DISTRICT OF ILLINOIS**<br>**EASTERN DIVISION**<br>**UNITED STATES SECURITIES**<br>**AND EXCHANGE COMMISSION,**<br>**Plaintiff,**<br>**v.**<br>**NORTHRIDGE HOLDINGS, LTD., ET AL.,**<br>**Defendants.** | **Civil Action No. 19-cv-05957**<br><br>**Hon. John Z. Lee**<br><br>**Magistrate Judge Susan E. Cox** |

**PROOF OF CLAIM FORM**

Please refer to the Notice of Claims Bar Date and Procedures for Submitting Proof of Claim for Instructions on how to submit a claim

**CLAIMANT INFORMATION**

Claimant ID No. (*Populated for mailed claims*)

AMERICAN REALTY SERVICES INC.
Name

6650 NORTHWEST HWY 3RD FLR
Street Address

CHICAGO ILLINOIS 60631
City/State/Zip Code/Country

773-631-0909
Telephone Number

LAVI809@AOL.COM
Email Address

36-4276607
Last four digits of TAX. ID No or SSN

☐   Check this box if you are updating your address

☒   Check this box if you are representing the Claimant – Provide YOUR information below

| Name | Name of Firm |
| --- | --- |
| TIM BIASIELLO | LAW OFFICES OF TIM BIASIELLO |
| **Street Address** | |
| 617 W. Devon Avenue | Park Ridge, IL 60068 |
| **City/State/Zip Code/Country** | |
| Park Ridge, IL   60068 | U.S.A. |
| **Telephone Number** | **Email Address** |
| 847-825-7744 | timbslo@yahoo.com |

Case: 1:19-cv-05957 Document #: 169-3 Filed: 08/13/20 Page 3 of 4 PageID #:2371

| CLAIM INFORMATION |
|---|

☐  Check this box if this claim is an Investor Claim

An Investor Claim is a Claim against any Northridge Entity based on an investment transaction in, with, or through a Northridge Entity, including but not limited to transactions based on or related to: (a) promissory notes or other money loaned to a Northridge Entity, or (b) investments (by subscription or otherwise) in a Northridge Entity.

**If you AGREE with the information and amounts in the attachments to the Notice of Receiver's Initial Determination, then you do not need to submit this form. Please check the "agree" box on the response form attached to the Notice of Receiver's Initial Determination and return to the Claims Agent as instructed in the Notice of Receiver's Initial Determination.**

Name of entity your claim is against:_____

Investor Claim Amount  $_____

☒  Check this box if this claim is a General Creditor Claim

A General Creditor Claim is a Claim against a Northridge Entity that is not an Investor Claim.

Name of entity your claim is against: _Northridge Holdings, LTD_
                                    561 Deere Park Circle LP
General Creditor Claim Amount  $____$200,000.00_

☐  Check this box if this claim is an Administrative Claim

An Administrative Claim is a Claim based on: (a) the provision of goods or services for the benefit of the Receivership Estate or at the request of the Receiver beginning on or after September 12, 2019, which remain unpaid, (b) any taxes arising from or attributable to tax periods beginning on or after September 12, 2019, including those that may be asserted by federal, state, local or other governmental entities or authorities, which remain unpaid, (c) an uncashed check issued on or after September 12, 2019 for a refund on account of a healthcare account receivable overpayment or student loan account receivable overpayment or any other overpayment, or (d)  any current, future or contingent contractual obligations (including indemnification obligations) arising from any contract entered into by or on behalf of the Receivership Estate.

Name of entity your claim is against: _____

Administrative Creditor Claim Amount  $_____

| SUPPORTING DOCUMENTS: |
|---|

**Investor Claimants:** Please Review the NOTICE OF RECEIVER'S INITIAL DETERMINATION for instructions of supporting documents to attach to your Proof of Claim Form. DO NOT SEND ORIGINAL DOCUMENTS.
**General Creditor Claimants and Administrative Claimants:** Please review the NOTICE OF CLAIMS BAR DATE AND PROCEDURES FOR SUBMITTING A PROOF OF CLAIM for instructions of supporting documents to attach to  your Proof of Claim. DO NOT SEND ORIGINAL DOCUMENTS.

Case: 1:19-cv-05957 Document #: 169-3 Filed: 08/13/20 Page 4 of 4 PageID #:2372

---

**SIGNATURE**

Please read carefully: To the extent the Claimant submitting this Proof of Claim is an Investor, submission of a Proof of Claim is a representation that: (a) none of the funds Investor invested in the Receivership Entities and that Investor claims a right to recover originated from the Receivership Entities, Glenn Mueller or any of Mr. Mueller's family or any entity owned or controlled by Mr. Mueller or any of Mr. Mueller's family;  (b) the distribution on account of Investor's claim (if any) will not be shared in any way with Mr. Mueller, a member of Mr. Mueller's family, an entity owned or controlled by Mr. Mueller or a member of his family or in any way for the benefit of Mr. Mueller or his family; and (c) the Proof of Claim represents the full extent of the Receivership Estate's liability to the Claimant.

I hereby certify under penalty of perjury that the information contained in this Proof of Claim is true and correct.

Signature: _Louis A Virgilio_

Print Name: _AMERICAN REALTY SERVICES INC_

Title (if any): _PRESIDENT_

Dated: _____

---

THIS PROOF OF CLAIM FORM MUST BE TIMELY AND PROPERLY SUBMITTED TO THE RECEIVER'S CLAIMS AGENT WITH A POSTMARK DATED NO LATER THAN _____ (CLAIMS BAR DATE):

Northridge Holdings
2807 Allen Street, Box 377
Dallas, Texas 75204

ANY CLAIMANT (INCLUDING AN ADMINISTRATIVE CLAIMANT OR AN INVESTOR) WHO IS REQUIRED TO SUBMIT A PROOF OF CLAIM, BUT THAT FAILS TO DO SO IN A TIMELY MANNER OR IN THE PROPER FORM, SHALL (a) BE FOREVER BARRED, ESTOPPED, AND ENJOINED TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW FROM ASSERTING, IN ANY MANNER, SUCH CLAIM AGAINST (i) ANY NORTHRIDGE ENTITY, (ii) THE RECEIVERSHIP ESTATE OR ITS ASSETS, AND (b) SHALL NOT RECEIVE ANY DISTRIBUTION FROM THE RECEIVERSHIP ESTATE OR HAVE STANDING TO OBJECT TO ANY DISTRIBUTION PLAN PROPOSED BY THE RECEIVER. FURTHER, THE RECEIVER SHALL HAVE NO FURTHER OBLIGATION TO PROVIDE ANY NOTICES TO YOU ON ACCOUNT OF SUCH CLAIM AND THE RECEIVERSHIP ESTATE SHALL BE DISCHARGED FROM ANY AND ALL INDEBTEDNESS OR LIABILITY WITH RESPECT TO SUCH CLAIM.

For more information visit our website at https://northridgereceiver.alixpartners.com
To talk to our team please call our hotline at 888-369-8932.

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ) ) | |
| Plaintiff, ) | Civil Action No. 19-cv-05957 |
| ) | |
| v. ) | Hon. John Z. Lee |
| ) | |
| NORTHRIDGE HOLDINGS, LTD, et.al. ) | Magistrate Judge Susan E. Cox |
| ) | |
| Defendants, ) | |

# CLAIM

## AMERICAN REALTY SERVICES, INC.
## v.
## NORTHRIDGE HOLDINGS, LTD. and
## 561 DEERE PARK CIRCLE, LP

NOW COMES the Claimant, American Realty Services, Inc., by and through its attorney, THE LAW OFFICES OF TIM BIASIELLO, making a claim against Northridge Holdings, LTD, and 561 Deere Park Circle, LP, both being Receivership Assets in the above captioned matter, and in furtherance thereof, states as follows:

1.      On or about February 12, 2019 the claimant, American Realty Services, Inc. entered into a Commercial Property Exclusive Right to Sell/Lease Agreement with Northridge Holdings, LTD., the General Partner of the 561 Deere Park Circle, LP to market the real property located at 561, 562, 563, and 564 Deere Park Circle in Bartlett, Illinois. A copy of which is attached as Exhibit "A".

2.      ¶ 11 of that Agreement provided for the payment of a brokerage fee of Six percent (6%), to be distributed 3.5% of the sales price to the Listing broker, and 2.5% of the selling price, less $750.00, to the Selling Broker.

1

3.    ¶ 22 of that Agreement provided:

"Earnest Money: (This paragraph applies to a sale only.) The Earnest Money shall be held by the Escrowee identified in the Real Estate Sales Contract ("Escrowee") in trust for the mutual benefit of the Parties in a manner consistent with Illinois State Law. Upon initial closing, or settlement, or *upon a breach of Contract, the Earnest money shall be applied first to the payment of any expenses incurred by the Brokerage on Client's behalf in the sale, and second to payment of the Brokerage's sales commission,* rendering the surplus, if any, to the client."

4.    After entering into the Brokerage Agreement, American Realty Services, Inc. performed brokerage services on behalf of the Seller, and was successful in procuring a prospective purchaser for the real property at 561, 562, 563, and 564 Deere Park Circle in Bartlett, Illinois.

5.    On or about January 14, 2019, Warburg Equities, LLC entered into a written agreement in which it agreed to purchase the real property located at 561 Deer Park Circle, Bartlett, Illinois from Northridge Holdings LTD and the Parkway Bank & Trust Company as Trustee under the Provisions of a Trust Agreement dated January 19, 2006 and Known as Trust Number #14106 for the sum of Twenty Two Million Five Hundred Thousand Dollars ($22,500,000.00) *See Exhibit "B" attached hereto and made a part hereof.*

6.    That agreement was amended from time to time, and on March 22, 2019, the parties entered into a Fourth Amendment to the said purchase agreement. *See Exhibit "C". attached hereto and made a part hereof.*

7.    That Fourth Amendment to the purchase agreement  acknowledged that Warburg Equities LLC had already made a timely deposit of ONE HUNDRED THOUSAND DOLLARS ($100,000.00 in the form of an initial deposit in Escrow with the Chicago Title Insurance Company. That Fourth Amendment to the agreement further provided that the Purchaser need make a second deposit of an additional ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000.00) into escrow with the Chicago Title and Trust Company. *See ¶ 2 Exhibit "C"*

2

8.      Notwithstanding the duty to deposit $150,000.00 into escrow, on or about March 25, 2019, Warburg Equities, LLC, only deposited $100,000.00 into the said Chicago Title and Trust Company Escrow #18PSA453024XLPJ.

9.      On or about March 25, 2019, the purchaser advised the Seller of its inability to provide the entire second deposit. At that time the Seller agreed to refrain from declaring a default on the contract in exchange for the purchaser's agreement to waive the contractual requirement that the earnest money be held by a third party escrow agent, but rather agree to permit the Escrow Agent, Chicago Title and Trust Company, pursuant to Escrow #18PSA453024XLPJ, to release the initially deposited earnest money in the amount of $100,000 from the escrow, as well as the additionally deposited $100,000.00, and wire transfer those funds directly to the seller, Northridge Holdings, LTD., the General Partner of the 561 Deere Park Circle, LP. *See Exhibit "D"*.

10.      On or about March 25, 2019, the Purchaser then directed the Chicago Title and Trust Company to release the original $100,000.00 from escrow and wire transfer those funds and wire transfer those funds to the Seller, *See Exhibit "E" attached hereto and made a part hereof*. The purchase further agreed, on March 28, 2019, to direct the Chicago Title and Trust Company to also release the second $100,000 deposit into the said Chicago Title and Trust Company Escrow, and wire transfer those funds to the Seller in exchange for the Seller's agreement to refrain from declaring a default on the Contract for the Purchaser's failure to comply with the contract terms by failing to make the make the full second deposit of $150,000.00, and for the Seller's further consideration to continue to agree to a April 29, 2019 default closing date. *See Exhibit "F" attached hereto and made a part hereof*.

11.      Notwithstanding the duties imposed upon the Purchaser pursuant to the Purchase agreement, and the Amendments thereto, the Purchaser failed to perform, and failed to close the said transaction on or before April 29, 2019. *See Exhibit "D"*.

12.      The Claimant asserts that pursuant to ¶ 22 of its Commercial Property Exclusive Right to Sell/Lease Agreement with Northridge Holdings, LTD, the earnest money deposit of $200,000.00

3

"applied first to the payment of any expenses incurred by the Brokerage on Client's behalf in the sale, and second to payment of the Brokerage's sales commission" prior to any distribution to the Seller.

13.     Notwithstanding that those funds rightfully belong the Claimant in accordance with the agreements as indicated above, those funds remain in the Receivership Estate.

Wherefore, the Claimant makes a claim against Northridge Holdings, LTD. and 561 Deere Park Circle, LP in the amount of TWO HUNDRED THOUSAND DOLLARS ($200,000.00).

Accordingly, the Claimant makes claim of $200,000.00 against Northridge Holdings, LTD, and 561 Deere Park Circle, LP.

Respectfully submitted,

Attorneys for the Claimant

LAW OFFICES OF TIM BIASIELLO
Attorneys for the Plaintiff
617 West Devon Avenue
Park Ridge, IL 60068
847-825-7744
timbslo@yahoo.com
IL # 0204501

EXHIBIT "A"



# MAINSTREET ORGANIZATION OF REALTORS®
## COMMERCIAL PROPERTY EXCLUSIVE RIGHT TO SELL/LEASE AGREEMENT



AMERICAN REALTY SERVICES INC.

**BROKERAGE (Print Listing Office Name)**

LOUIS A. VIRGILIO

**MANAGING BROKER NAME (Print)**

LOUIS A. VIRGILIO

**DESIGNATED AGENT NAME (Print)**

NORTHRIDGE HOLDINGS LTD. GENERAL PARTNER

**SELLER/LANDLORD NAME (Print)**

_561 DEERE PARK CIRCLE L.P._

**SELLER/LANDLORD NAME (Print)**

Seller/Landlord represents and warrants that title to the property is in the name of _561 DEERE PARK CIRCLE L.P._ _____ and Seller/Landlord has the authority to sell/lease the Property.

For the purposes of this Exclusive Right to Sell/Lease Agreement, the use of the term "Client" shall include in addition thereto, the term "Seller/ Landlord" (circle one); the use of the term "buyer" shall include the term "tenant"; and the uses of the plural form or the possessive form of the terms "Client" and "buyer" shall also include the plural form and the possessive form of the terms "Seller/Landlord" and "tenant".

**1. Property:** This Agreement is between the above-mentioned Brokerage and Client, in consideration of their acceptance of the terms hereof and, efforts of Brokerage to advertise, market, promote, and sell/lease the real estate commonly known as:
Address: 561,562,563 and 564 DEERE PARK CIRCLE
Unit No: _____, City: BARTLETT
County: COOK _____, State: ILLINOIS _____, Zip Code: 60103
Permanent Index No.: _____, hereinafter referred to as "Property."

For Condo or Coop if parking space is included: (check type) ☐ deeded space; ☐ limited common element; ☐ assigned: Parking Space # ___

AGREEMENT between AMERICAN REALTY SERVICES INC _____
hereinafter referred to as "BROKER" and NORTHRIDGE HOLDINGS LTD MANAGING PARTNER _____ hereinafter referred to as "CLIENT."

**2. Term and Conditions:** Beginning 12:01 A.M. Month: FEBRUARY0 _____ Day: 12 _____ Year: 20 19 ____ and terminating 11:59 P.M. Month: FEBRUARY _____ Day: 12 _____ Year: 20 20 _____ Client gives to Broker the exclusive right to sell, lease, option or exchange the Property to qualified buyers and to share the Property with Participants in the Midwest Real Estate Data, LLC, Inc. and/or any Multiple Listing Service in which Broker is a Participant in accordance with the applicable rules and regulations of that Multiple Listing Service.

( _____ ) **THE PARTIES UNDERSTAND AND AGREE THAT IT IS ILLEGAL TO DISCRIMINATE**
(Client's Initials) **AGAINST ANY PROSPECTIVE BUYER OR TENANT ON THE BASIS OF RACE, AGE, COLOR, RELIGION, SEX, ANCESTRY, MARITAL STATUS, PHYSICAL OR MENTAL HANDICAP, FAMILIAL STATUS, NATIONAL ORIGIN, SEXUAL ORIENTATION, MILITARY STATUS, DISHONORABLE DISCHARGE FROM THE MILITARY SERVICE, OR ANY OTHER CLASS PROTECTED BY THE ILLINOIS HUMAN RIGHTS ACT. THE PARTIES AGREE TO COMPLY WITH ALL APPLICABLE FEDERAL, STATE, AND LOCAL FAIR HOUSING LAWS.**

**3. Marketing Price:** If for sale, the price shall be $ 23,000,000.00 _____
If for lease, the lease price shall be $ NOT APPLICABLE _____.
_____ (choose one) per month/per year.

**4. Title:** Title is in the name of _____
and Client represents that Client has the authority to sell/lease the premises.

**5. Client's Designated Agent:** Managing Broker designates and Client accepts: LOUIS A. VIRGILIO
("Client's Designated Agent"), a licensee affiliated with Managing Broker, as the only legal agent of Client to market and sell/lease Client's Property. Managing Broker reserves the right to appoint additional designated agents for Client when, in Managing Broker's discretion, it is necessary. If additional designated agents are appointed, Client shall be informed in writing within a reasonable time of such appointment. Client authorizes Client's Designated Agent, from time to time, to allow another

LAV _Managing Broker Initial_
_Address:_ 561,562,563, AND 564 DEERE PARK CIRCLE, BARTLETT ILLINOIS 60103

_____ Client(s) Initial _____ Client(s) Initial

_(Page 1 of 8) Rev.2.2014 © MAINSTREET ORGANIZATION OF REALTORS'_

55 licensee, who is not an agent of the Client, to conduct an open house of Client Property or provide similar support to Designated
56 Agent in the marketing of Client's Property. Client understands and agrees that this Agreement is a contract for Brokerage to
57 market and sell/lease Client's Property and that Client's Designated Agent is the only legal agent of Client. Client's Designated
58 Agent will be primarily responsible for the direct marketing and sale/lease of Client's Property. The duties owed to Client as
59 referred in the Illinois Real Estate License Act of 2000, as amended, will only be owed to Client by the Designated Agent. The
60 Managing Broker and the Designated Agent will have only those duties to the Client as are required by statute.
61

62 **6. Possible Dual Agency:** The above named Designated Agent (hereinafter sometimes referred to as "Licensee") may undertake a
63 dual representation (represent both the seller or landlord and the buyer or tenant) for the sale or lease of the Property.
64 Seller/Landlord acknowledges he was informed of the possibility of this type of representation. Before signing this document,
65 Seller/Landlord must read the following:
66

67 Representing more than one party to a transaction presents a conflict of interest, since both clients may rely upon Licensee's
68 advice and the clients' respective interests may be adverse to each other. Licensee will undertake this representation only with the
69 written consent of ALL clients in the transaction. Any agreement between the clients as to a final contract price and other terms is
70 a result of negotiations between the clients acting in their own best interests and on their own behalf. Seller/Landlord
71 acknowledges that Licensee has explained the implications of dual representation, including the risks involved, and understands
72 that he has been advised to seek independent advice from advisors or attorneys before signing any documents in this transaction.
73

74 WHAT A LICENSEE CAN DO FOR CLIENTS WHEN ACTING AS A DUAL AGENT:
75 1. Treat all clients honestly.
76 2. Provide information about the Property to the buyer or tenant.
77 3. Disclose all latent material defects in the Property that are known to Licensee.
78 4. Disclose financial qualification of the buyer or tenant to the Seller or Landlord.
79 5. Explain real estate terms.
80 6. Help the buyer or tenant to arrange for Property inspections.
81 7. Explain closing costs and procedures.
82 8. Help the buyer compare financing alternatives.
83 9. Provide information about comparable properties that have sold so both clients may make educated decisions on what
84 price to accept or offer.
85

86 WHAT A LICENSEE CANNOT DISCLOSE TO CLIENTS WHEN ACTING AS A DUAL AGENT:
87 1. Confidential information that Licensee may know about the clients, without the client's permission.
88 2. The price or terms the seller or landlord will take other than the listing price without permission of the seller or landlord.
89 3. The price or terms the buyer or tenant is willing to pay without permission of the buyer or tenant.
90 4. A recommended or suggested price or terms the buyer or tenant should offer.
91 5. A recommended or suggested price or terms the seller or landlord should counter with or accept.
92

93 **If Seller/Landlord is uncomfortable with this disclosure and dual representation, please let Licensee know.**
94 **Seller/Landlord is not required to accept this section unless Seller/Landlord wants to allow the Licensee to proceed as a**
95 **Dual Agent in this transaction.**
96

97 ☑             ☐             By checking "Yes" and initialing, Seller/Landlord acknowledges that Seller/Landlord has read and
98 Yes           No            understands this section and voluntarily consents to the Licensee acting as Dual Agent (that is, to
99 (_____/_____)           represent BOTH the Seller and buyer or Landlord and tenant) should that become necessary.
100        (Client(s) Initial(s))
101

102 **7. Representation of Buyers/Tenants:** Client acknowledges that Client has been informed and understands that as part of
103 Brokerage's real estate business, Brokerage, from time to time, enters into representation agreements with buyers/tenants, and, as
104 such, may designate certain of its licensees as exclusive buyers'/tenants' representatives for the purpose of showing and
105 negotiating the purchase of real estate listed with Brokerage or other real estate brokerage firms.
106

107 **8. Buyer/Tenant Confidentiality:** Client understands that Brokerage, Managing Broker and/or Designated Agent may have
108 previously represented a buyer/tenant who is interested in Client's Property. During that representation, Managing Broker and/or
109 Designated Agent may have learned material information about the buyer/tenant that is considered confidential. Under the law,
110 neither Managing Broker nor Designated Agent may disclose any such confidential information to Client even though the
111 Managing Broker and/or Designated Agent now represent the Client.
112

LAV   *Managing Broker Initial* _____    ∿∿ *Client(s) Initial* _____ *Client(s) Initial*
*Address:* 561,562,563 AND 564 DEERE PARK CIRCLE, BARTLETT ILLINOIS 60103

**9. Managing Broker's Licensees:** Client understands and agrees that other licensees affiliated with Brokerage, may represent the actual or prospective buyer of Client's Property. Further, Client understands and agrees that if the Property is sold or leased through the efforts of a licensee affiliated with Brokerage that represents the buyer, the other licensee affiliated with Brokerage will be acting as a buyer's representative.

**10. Consent to Represent Other Clients:** Client understands and agrees that Brokerage, Managing Broker and Designated Agent may from time to time represent or assist other sellers/landlords who may be interested in selling/leasing their property to buyers/tenants. The Client consents to Brokerage, Managing Broker's and Designated Agent's representation of such other sellers/landlords before, during, and after the expiration of this Exclusive Marketing Agreement and expressly waives any claims including but not limited to breach of duty or breach of contract based solely upon Brokerage, Managing Broker's or Designated Agent's representation or assistance of other sellers/landlords who may be interested in selling/leasing their property to buyers/tenants.

**11. Brokerage Fee**: Except as provided hereafter, in consideration of the obligations of the Brokerage, the Client agrees:

**For Sale**

(a) To pay Brokerage, at the time of closing of the sale of the property and from the disbursement of the proceeds of said sale, compensation in the amount of, for Brokerage's services 6%_____(to be distributed 3.5%_____ of the sales price to the listing office and 2.5% LESS $750.00_____ of the sales price to the selling office) in effecting the sale by finding a Buyer ready, willing, and able to purchase the property. If the transaction shall not be closed because of refusal, failure, or inability of the Client to perform, the Client shall pay the sales commission in full to Brokerage upon demand. Should a sale be in pending or contingent status at the expiration of this Agreement, Client shall pay Brokerage the full commission set forth upon closing of said sale.

**For Lease**

(b) To pay Brokerage at the time of lease execution or upon an event or events specified in Paragraph 16 hereof, for Brokerage services a total leasing commission of NOT APPLICABLE_____(to be distributed _____ of the total commission to the listing office and_____of the total commission to the leasing office). If the above conditions are not met because of the refusal, failure or inability of the Landlord to perform, Landlord shall pay the Brokerage fee in full to Brokerage upon demand. In the event the property is leased and Tenant subsequently purchases the property within _____ months after the expiration of said lease, Brokerage shall, in addition to any fee for leasing the property, also be entitled to the Brokerage Fee for the sale of the property in accordance with the terms and conditions as defined in subparagraph (a) of this paragraph..

(c) To pay Brokerage the commission specified above if Brokerage procures a buyer or tenant, if the Property is sold or leased within said time by Client or any other person, or if the property is sold or leased within _____ days from the expiration date herein to any person to whom the said listing information was submitted during the term of this exclusive agreement. However, Client shall not be obligated to pay said commission if a valid, written listing agreement is entered into during the term of said protection period with another brokerage and the sale or lease of the Property is made during the term of the subsequent listing agreement.

**12. Cooperation and Compensation:** Broker is authorized to show the Property to prospective buyers/lessees through cooperating agents; and Broker, on a case by case basis, may pay a part of the above commission to cooperating agents. Broker is authorized in its sole discretion to determine with which brokers it will cooperate, and the amount of compensation that it will offer cooperating brokers in the sale of Client's property. Client acknowledges that the compensation offered to such cooperating brokers may vary from broker to broker.

**13. Virtual Office Website Policy:** If Brokerage operates a Virtual Office Website ("VOW") the following shall apply: for the purpose of marketing properties to consumers on the Internet who have established a brokerage-consumer relationship, as defined by Illinois Real Estate License Act of 2000, as amended, giving the consumer the opportunity to search for active and closed listing data, subject to Brokerage's oversight, supervision and accountability. The VOW Policy states that a VOW shall not display listings or property addresses of any seller who has affirmatively directed the brokerage to withhold the seller's listing or property address from display on the Internet. A VOW may allow third parties to write comments or reviews about particular listings or display a hyperlink to such comments or review in immediate conjunction with particular listings or display an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing. The Policy allows the Brokerage to disable or discontinue, at Client's request, either or both of the aforementioned VOW features (display of listing and display of listing address and ability to make comments or display estimate of market value).

LAV   *Managing Broker Initial*                                    *Client(s) Initial* _____ *Client(s) Initial*
*Address:* 561,562,563,AND 564 DEERE PARK CIRCLE, BARTLETT ILLINOIS 60103

**WITH REGARD TO THE VOW POLICY, CLIENT HEREBY DIRECTS BROKERAGE AS FOLLOWS (Initial that apply):**

(_____/_____) I do NOT want the Property listing to be displayed on the Internet.

(_____/_____) I do NOT want the Property address to be displayed on the Internet.

(_____/_____) I do NOT give permission for comments or reviews on my listing.

(_____/_____) I do NOT want any automated estimate of value on my listing.

Client acknowledges that Client has read and understands the options presented above and that, if Client has selected the first option, consumers who conduct searches for listings on the Internet will not see information about Client's Property in response to their search.

**14. Title Insurance and Survey:** (This paragraph applies to a sale only.) Client acknowledges that Client has not added to nor disposed of any part of the Property, or gained any easements in favor of or against the Property not disclosed in the Title Guaranty Policy except as stated herein. Prior to closing, Client agrees to furnish at Client's expense a title insurance commitment for an Owner's Title Insurance Policy in the amount of the sale price, showing good title in the owner's name. After a sales contract has been signed, arrangements must be made to secure title insurance and schedule the closing. Client understands that Client is not required to use any particular title insurance company and that Client or Client's attorney may select any qualified licensed company for Client's title insurance needs. Not less than one (1) business day prior to closing, except where the subject property is a condominium, Client may be required, at Client's expense, to furnish a Plat of Survey dated not more than six (6) months prior to the date of closing, prepared by an Illinois registered land surveyor, performed pursuant to the Minimum Standard Detail requirements for ALTA/ACSM Land Title Surveys adopted by the American Land Title Association (ALTA) and the American College of Surveying and Mapping (ACSM). The standards are published on the ACSM website at www.acsm.net and on the ALTA website at www.alta.org. The applicable provisions of 68 Ill. Admin. Code #1270.56 (as amended from time to time) shall also be incorporated into this paragraph by reference.

With regard to the issuance of title insurance:

☐ (_____/_____) Client authorizes Brokerage to order title insurance and related services on Client's behalf through an
   *Client(s) Initials*   affiliate of Brokerage, for the estimated charges as disclosed in the Federal and State Disclosure Statements provided Client by Brokerage.

☐ (_____/_____) Client directs that _____ provide the title insurance and
   *Client(s) Initials*   related services as stated above.

☐ (_____/_____) Client or Client's attorney will make the necessary arrangements for title insurance and any related
   *Client(s) Initials*   services.

**15. Fixtures and Personal Property:** In the event of a sale of the property, included in the purchase price are: hot water heater; plumbing and electrical fixtures; sump pumps; central heating and cooling; humidifying and filtering equipment; fixed carpeting; equipment, and cabinets, water softener (except rental units) storm and screen windows and doors; attached shutters, blinds and shades, all planted vegetation; with all improvements and fixtures, if any, (all of which hereinafter referred to as Equipment), shall be left on the Property and shall be transferred to the Buyer by a Bill of Sale at the time of closing. The following items shall also be left on the Property and be conveyed to buyer at time of closing:

_____
_____

Excluded items: _____
_____

In an event of a lease of the property the items mentioned above as included items will remain on the premises for the benefit of the tenant.

All the aforementioned Equipment remaining with the Property is paid for, belongs to Client, and will be in operating condition at the time of closing, except for the following: _____
_____

LAV   *Managing Broker Initial*                              _____ *Client(s) Initial* _____ *Client(s) Initial*
*Address:* 561,562,563,AND 564 DEERE PARK CIRCLE, BARTLETT ILLINOIS 60103

*(Page 4 of 8) Rev.2.2014 © MAINSTREET ORGANIZATION OF REALTORS®*

**16. Commission Earned:** A commission shall be deemed to have been earned at such time as: (a) a sales or exchange contract, is executed and all contingencies are met; (b) an option contract is executed; (c) an option contract is exercised; or, (d) a lease is executed and all contingencies are met involving the Property, and shall be paid in accordance with terms of Paragraph 11.

**17. Disclosure:** (This paragraph applies to a sale only.) All inquires about this Property made directly to Client shall be immediately referred to Managing Broker and/or Client's Designated Agent. Client understands that the information which Client provides to Client's Designated Agent as marketing information will be used to advertise Client's Property to the public and submitted to the Multiple Listing Service. It is essential that this information be accurate and truthful. If applicable, Client agrees to comply with the provisions of the Illinois Residential Real Property Disclosure Act, the Illinois Radon Awareness Act and, the Federal Lead Based Paint Disclosure Regulations. Client shall complete the applicable disclosure document(s) in a timely manner, shall not knowingly provide false or inaccurate information therein, and shall comply with all local government ordinances. Although Client is marketing Client's Property in its present physical condition, Client understands that Client may be held responsible by a buyer for any latent or hidden, undisclosed defects in the Property which are known to Client but which are not disclosed to buyer. Client shall indemnify, save, defend and hold Brokerage, Managing Broker, and Client's Designated Agent harmless from all claims, disputes, litigation, judgments and/or costs (including reasonable attorney's fees), whether or not frivolous, arising from any misrepresentations made by the Client, from any incorrect information supplied by the Client, or from any material fact concerning the Property including latent defects which the Client fails to disclose. Further, Client shall indemnify, save, defend, and hold Brokerage, Managing Broker, and Client's Designated Agent harmless from any claim, loss, damage, or injury to any person or Property while viewing the Property arising from the condition of Client's Property.

**18. Limitations:** The sole duty of the Brokerage is to affect a sale or lease of the Property. The Brokerage, Managing Broker, Client's Designated Agent, members of the Multiple Listing Service(s) to which the Managing Broker belongs, and the Mainstreet Organization of REALTORS* are not charged with the custody of the Property, its management, maintenance, upkeep, or repair. Illinois law allows licensees to prepare the sales contract or lease using approved preprinted forms, but does not allow licensees to draft other legal documents required to close a sale. Therefore, the Client agrees to draft and furnish, or have Client's attorney draft and furnish all other legal documents necessary to close a sale.

**19. Minimum Standards:** Illinois Real Estate License Act of 2000, as amended, provides that all exclusive brokerage agreements must specify that the sponsoring broker, through one or more sponsored licensees, must provide at a minimum, the following services: (1) accept delivery of and present to the client offers and counter-offers to buy, sell, or lease the client's property or the property the client seeks to purchase or lease; (2) assist the client in developing, communicating, negotiating, and presenting offers, counter offers, and notices that relate to the offers and counteroffers until a lease or purchase agreement is signed and all contingencies are satisfied or waived; and (3) answer the client's questions relating to the offers, counter-offers, notices, and contingencies.

**20. Marketing Authorization:** Brokerage is authorized to advertise, promote, and market the Property which shall include, but not be limited to, in Managing Broker's sole discretion, the display of signs, placement of the Property in any Multiple Listing Service in which Managing Broker is a participant, and promotion of the Property through any electronic medium and/or on any Internet Website to which the Brokerage, Managing Broker and/or Designated Agent may subscribe. Brokerage is authorized to affix a keybox to the Property, and provided the owner is absent, any MLS participant or subscriber associated with the Multiple Listing Service(s), whether acting as a buyer's representative or otherwise, shall have the right, through use of said keybox, to show the Property at any reasonable time. It is not a requirement of the Multiple Listing Service or Brokerage that a Client allow use of a keybox. Client acknowledges that neither listing nor selling brokerage, the Mainstreet Organization of REALTORS*, nor any Multiple Listing Service is an insurer against the loss of Client's personal property. Client is advised to safeguard or remove valuables now located on said Property. Client is further advised to verify the existence of said valuables and obtain personal property insurance through Client's insurance agent. Further, Client hereby grants Brokerage and Brokerage shall have the right, and Client acknowledges that Managing Broker may have an obligation under applicable Multiple Listing Service rules and regulations as a condition of placing Client Property in such Multiple Listing Service, to release information as to the amount of selling price, the rent, type of financing, and number of days to sell/lease the Property to any Multiple Listing Service of which Managing Broker is a participant at the time the Property is sold and closed or leased.

**21. Taxes and Assessments:** (This paragraph applies to a sale only.) All taxes and all usually prorated expenses shall be prorated pursuant to the terms of the sales contract. Client shall disclose any assessments or special taxes for improvements or lien for improvements, either of record or in process, applicable to the Property marketed herein, and should the Client receive any notice thereof, Client agrees to notify the Managing Broker or Designated Agent immediately.

(a) SPECIAL ASSESSMENTS: **Client represents that there: [check one]** ☐ **is** ☐ **is not** a proposed or pending unconfirmed special assessment affecting the property not payable by Client after the date of closing. Client further represents that the

LAV *Managing Broker Initial*          _____ *Client(s) Initial* _____ *Client(s) Initial*
*Address:* 561,562,563,AND 564 DEERE PARK CIRCLE, BARTLETT ILLINOIS 60103

*(Page 5 of 8) Rev.2.2014 © MAINSTREET ORGANIZATION OF REALTORS'*

following confirmed special assessments are not due or will be due after the date of closing: _____ in the amount of $ _____.

(b) SPECIAL SERVICE AREA: **Client represents that the property: |check one|** ☐ **is** ☐ **is not** located within a Special Service Area, payments for which will not be the obligation of Client after the date of Closing.

(c) CONDOMINIUM OR COMMON INTEREST COMMUNITY ASSOCIATION(S): **The property and improvements described herein |check one|** ☐ **are** ☐ **are not** part of a Condominium or or Common Interest Community Association. If so, the contact information for such association is: _____

Association Name: _____ Phone Number: _____

Management Company Name: _____ Phone Number: _____

(d) ASSOCIATION ASSESSMENTS/FEES: Client acknowledges a current Condominium or Common Interest Community Association Assessment/Fee of $_____ per _____ which includes: _____
_____
_____

(e) ADDITIONAL ASSOCIATION ASSESSMENTS/FEES: Client further acknowledges additional assessments/fees (such as a Master Association Fee) of $_____ per _____ which includes: _____
_____
_____

**22. Earnest Money: (This paragraph applies to a sale only.) The Earnest Money shall be held by the Escrowee identified in the Real Estate Sales Contract ("Escrowee") in trust for the mutual benefit of the Parties in a manner consistent with Illinois State Law. Upon initial closing, or settlement, or upon breach of Contract, the Earnest Money shall be applied first to the payment of any expenses incurred by the Brokerage on Client's behalf in the sale, and second to payment of the Brokerage's sales commission, rendering the surplus, if any, to the Client. If a dispute arises between Client and buyer as to whether a default has occurred, Escrowee shall hold the Earnest Money and pay it out as agreed in writing by Client and buyer or as directed by a court of competent jurisdiction. In the event of such dispute, Client agrees that Escrowee may deposit the funds with the clerk of the Circuit Court by an action in the nature of interpleader. Client agrees Brokerage may be reimbursed from the Earnest Money for all costs, including reasonable attorney's fees, related to the filing of the interpleader and hereby agrees to indemnify and hold Brokerage harmless from any and all claims and demands, including the payment of reasonable attorney's fees, costs, and expenses arising out of such default, claims, and demands. If Client defaults, Earnest Money, at the option of buyer, shall be refunded to buyer, but such refunding shall not release Client from the obligation of this Marketing Agreement. There shall be no disbursement of Earnest Money unless Escrowee has been provided written agreement from Client and buyer. In anticipation of closing, the parties shall direct Escrowee to close the account no sooner than 10 (ten) business days prior to the anticipated closing date.**

**23. Security Deposits (applicable for lease only): Unless a separate property management agreement is established between the Brokerage and the Landlord, the security deposit shall be paid to and held by the Landlord.**

**24. Amendments:** Should it be necessary to amend or modify this Agreement, facsimile signatures of all parties to this Marketing Agreement are accepted as original signatures. This Agreement may be executed in multiple copies and Client's signature hereon acknowledges that Client has received a signed copy.

**25. Mediation:** Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be mediated in accordance with rules then pertaining of the American Arbitration Association.

LAV  *Managing Broker Initial*  _____ *Client(s) Initial* _____ *Client(s) Initial*
*Address:*  561,562,563,AND 564 DEERE PARK CIRCLE, BARTLETT ILLINOIS 60103

**26. Indemnification:** Client agrees to indemnify Brokerage, Managing Broker and Designated Agent to save, defend, and hold them harmless on account of any and all loss, damage, cost, or expense (including reasonable attorney's fees) incurred by them arising out of this Agreement, or in the collection of fees or commissions due Brokerage pursuant to this Agreement, provided Brokerage is not found to be at fault.

**27. Disclaimer:** Client acknowledges that Brokerage, Managing Broker and Client's Designated Agent are acting solely as real estate professionals, and not as attorney, tax advisor, surveyor, structural engineer, home inspector, environmental consultant, architect, contractor, or other professional service provider. Client understands that such other professional service providers are available to render advice or services to the Client, if desired, at Client's expense.

**28. Costs of Third-Party Services or Products:** Client is responsible for the costs of all third-party products or services such as surveys, soil tests, title reports, well and septic tests, etc.

**29. Client Shall:** Supply Broker with the most recent accurate income and expense figures, lease for the Property, any mortgage information, if applicable, and any other pertinent information which, in the opinion of Broker, is necessary to assist the broker in the marketing of the Property. Client shall provide all information relevant to the condition, use and operation of the property available to Client to buyer. Client shall prepare, deliver to buyer, and record, if appropriate, all documentation for the property in accordance with all laws of any jurisdiction in which the property is located. Client shall also cooperate with buyer to secure whatever on-site assessment buyer or buyer's lender deems necessary or appropriate. In the event the property is a condominium or part of a Common Interest Community Association, Client should have available for Broker at time of listing agreement the following documents if applicable: Declaration of Condominium or Declaration of Covenants, Conditions and Easements; current budget; bylaws; financial statements; and any other rules and regulations in effect.

**30. Severability:** In case any one or more provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such as invalidity, illegality or unenforceability, it shall not effect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

**31. Notice:** All notices required shall be in writing and shall be served by one Party to the other Party. Notice to any one of the multiple-person Party shall be sufficient notice to all. Notice shall be given in the following manner:
    (a) By personal delivery of such notice; or
    (b) By mailing of such notice to the addresses recited herein by regular mail and by certified mail, return receipt requested. Except as otherwise provided herein, notice served by certified mail shall be effective on the date of mailing; or
    (c) By sending facsimile transmission. Notice shall be effective as of date and time of facsimile transmission, provided that the notice transmitted shall be sent on business days during business hours (8:00 A.M. to 6:00 P.M. Chicago Time). In the event fax notice is transmitted during non-business hours, the effective date and time of notice is the first hour of the first business day after transmission; or
    (d) By sending e-mail transmission. Notice shall be effective as of date and time of e-mail transmission, provided that the notice transmitted shall be sent on business days during business hours (8:00 A.M. to 6:00 P.M. Chicago Time), and provided further that the **recipient provides written acknowledgment to the sender** of receipt of the transmission (by e-mail, facsimile, or by regular mail). In the event e-mail notice is transmitted during non-business hours, the effective date and time of notice is the first hour of the first business day after transmission; or
    (e) By commercial overnight delivery (e.g., FedEx). Such Notice shall be effective on the next Business Day following deposit with the overnight delivery company.

**32. Entire Agreement:** This Agreement constitutes the complete understanding and entire agreement between the parties relating to the subject thereof, and any prior agreements pertaining thereto, whether oral or written, have been merged and integrated into this Agreement. This Agreement may not be terminated or amended prior to its termination date without the express written consent of both parties to this Agreement.

Client hereby acknowledges receipt of a signed copy of this Agreement and all attachments. The attachments include the following (HERE LIST ALL ATTACHMENTS): _____

_____

LAV__ *Managing Broker Initial*
*Address:* 561,562,563,AND 564 DEERE PARK CIRCLE, BARTLETT ILLINOIS 60103

_____ *Client(s) Initial* _____ *Client(s) Initial*

*(Page 7 of 8) Rev.2.2014 © MAINSTREET ORGANIZATION OF REALTORS®*

399
400
401     LOUIS A. VIRGILIO
402     _____
403     MANAGING BROKER (Print)
404
405     _____
406     MANAGING BROKER (Signature)
407     FEBRUARY 12, 2019
408     _____
      DATE
409     LOUIS A. VIRGILIO
410     _____
411     DESIGNATED AGENT (Print)
412     6650 NORTHWEST HIGHWAY
413     _____
414     OFFICE ADDRESS
415     CHICAGO      ILLINOIS     60631
416     _____
417     CITY       STATE      ZIP
418     773-744-8444
419     _____
420     DESIGNATED AGENT PHONE    FAX
421     773-631`-0909
422     _____
423     OFFICE PHONE
424     LAV1809@AOL.COM
425     _____
426     E-MAIL ADDRESS
427
428
429

*(Signatures required of all who have a legal or equitable interest in the Property)*

561 DEERE PARK CIRCLE E.
NORTHWEST 1405 DINSELLUS GLNERAL PARTNER
        GLENN MUELLER PRESIDENT.
_____
CLIENT (Print)

_____
CLIENT (Signature)

_____
CLIENT (Print)

_____
CLIENT (Signature)
    2-13-19
_____
DATE

_____
CURRENT MAILING ADDRESS

_____
CITY        STATE      ZIP

_____
E-MAIL ADDRESS

_____
PHONE         FAX

_____
CLIENT AUTHORIZED AGENT (Print)

EXHIBIT "B"

**AGREEMENT OF PURCHASE AND SALE**

by and between

**NORTHRIDGE HOLDINGS LTD**

a North Dakota corporation and **PARKWAY BANK & TRUST COMPANY AS TRUSTEE
UNDER THE PROVISIONS OF A TRUST AGREEMENT DATED JANUARY 19, 2006
AND KNOWN AS TRUST #14106**

(File Number 55215405)

and

**WARBURG EQUITIES, LLC,**

a Delaware limited liability company

(File Number 05886716)

or its assignee

("Purchaser")

Dated as of January 14, 2019

ARTICLE 1 .................................................................................................................................................. 1

INCORPORATION/INTEREST INCLUDED IN SALE .............................................................................. 1

   1.1    INCORPORATION/INTEREST INCLUDED IN SALE ...................................................................... 1

ARTICLE 2 PURCHASE PRICE .................................................................................................................. 2

ARTICLE 3 CLOSING ................................................................................................................................. 4

   3.1    CLOSING ............................................................................................................................... 4

ARTICLE 4 PURCHASER'S INSPECTION ................................................................................................. 5

   4.1    DELIVERIES BY SELLER ......................................................................................................... 5
   4.2    ACCESS TO THE PROPERTY .................................................................................................... 5
   4.3    RIGHT OF INSPECTION AND TERMINATION .............................................................................. 6

ARTICLE 5 TITLE AND SURVEY .............................................................................................................. 6

   5.1    TITLE .................................................................................................................................... 6
   5.2    SURVEY ................................................................................................................................ 7

ARTICLE 6 REPRESENTATIONS .............................................................................................................. 8

   6.1    REPRESENTATIONS OF THE SELLER ........................................................................................ 8

ARTICLE 7 COVENANTS .........................................................................................................................12

   7.1    OBLIGATIONS AND COVENANTS OF THE SELLER ...................................................................12

ARTICLE 8 APPORTIONMENTS ..............................................................................................................13

   8.1    APPORTIONMENTS ...............................................................................................................13

ARTICLE 9 CONDITIONS PRECEDENT TO CLOSING ...........................................................................15

   9.1    SELLER'S CONDITIONS TO CLOSING .....................................................................................15
   9.2    PURCHASER'S CONDITIONS TO CLOSING ...............................................................................15
   9.3    FAILURE OF CONDITION .......................................................................................................16

ARTICLE 10 CLOSING DELIVERIES ........................................................................................................16

ARTICLE 11 DEFAULTS ...........................................................................................................................18

ARTICLE 12 DESTRUCTION, LOSS OR DIMINUTION OF THE PROPERTY ..........................................18

ARTICLE 13 MISCELLANEOUS ...............................................................................................................19

   13.3   EXPENSES OF TRANSACTION ................................................................................................21
   13.4   BROKER ...............................................................................................................................21
   13.5   ASSIGNMENT .......................................................................................................................21
   13.6   TIME ...................................................................................................................................21
   13.7   TIME PERIODS .....................................................................................................................21
   13.8   COUNTERPARTS AND ELECTRONIC SIGNATURES ....................................................................21
   13.9   GOVERNING LAW .................................................................................................................21
   13.10  CAPTIONS ............................................................................................................................21
   13.11  SEVERABILITY ......................................................................................................................21
   13.12  PRIOR UNDERSTANDINGS ....................................................................................................22
   13.14  NO ADDITIONAL UNDERTAKINGS .........................................................................................22
   13.15  UNDERTAKINGS BY SELLER AND PURCHASER ......................................................................22
   13.16  ATTORNEYS' FEES ...............................................................................................................23
   13.17  CONFIDENTIALITY ...............................................................................................................23

## EXHIBITS

| | |
|---|---|
| EXHIBIT A | THE PROPERTIES |
| EXHIBIT B | LEASES |
| EXHIBIT C | RENT ROLL |
| EXHIBIT D | SERVICE CONTRACTS |
| EXHIBIT E | INTENTIONALLY DELETED |
| EXHIBIT F | BILL OF SALE |
| EXHIBIT G | ASSIGNMENT AND ASSUMPTION OF LEASES |
| EXHIBIT H | ASSIGNMENT AND ASSUMPTION OF SERVICE CONTRACTS |
| EXHIBIT I | FIRPTA CERTIFICATION |
| EXHIBIT J | REAFFIRMATION OF REPRESENTATIONS AND WARRANTIES |
| EXHIBIT K | SPECIAL ASSESSMENTS & LIENS |

## SCHEDULES

| | |
|---|---|
| SCHEDULE I | DUE DILIGENCE MATERIALS |

<u>**AGREEMENT OF PURCHASE AND SALE**</u>

    **THIS AGREEMENT OF PURCHASE AND SALE** (this "<u>Agreement</u>") is made and entered into this 14th day of January, 2019 (the "<u>Effective Date</u>"), by and between **NORTHRIDGE HOLDINGS, LTD, a North Dakota corporation ("Beneficiary") and Parkway Bank & Trust Company as Trustee under the provisions of a Trust Agreement dated January 19, 2006 and known as Trust # 14106 ("Trust")** (Beneficiary and Trust are collectively, the "<u>Seller</u>"), and **WARBURG EQUITIES, LLC a Delaware limited liability company,** or its assignee ("<u>Purchaser</u>"), having an office at 9501 W. 144th Suite 304 Orland Park, Illinois 60462.

RECITALS:

    **WHEREAS,** Seller is the owner of the real properties described on <u>Exhibit A</u> attached hereto (the "Property"); and

    **WHEREAS,** Seller desires to sell and convey to Purchaser or an assignee of Purchaser, and Purchaser or its assignee desires to purchase from Seller, the Property on the terms and conditions set forth herein;

    **NOW, THEREFORE,** for and in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser do hereby agree as follows:

**ARTICLE 1**
**INCORPORATION/INTEREST INCLUDED IN SALE**

1.1    Incorporation/Interest Included In Sale

    A.    **Incorporation**.  The preambles to this Agreement are fully incorporated herein by this reference thereto with the same force and effect as though restated herein.

    B.    **Sale of the Property**.  Seller agrees to sell and convey to Purchaser and Purchaser agrees to purchase from Seller for the Purchase Price (as defined in <u>Section 2</u> hereof) and upon the terms and conditions hereinafter set forth, the property which shall include the following:

    **(i)**    **Land**.  Those certain tracts of land owned in fee simple by Seller, which are described on <u>Exhibit A</u> attached hereto (the "<u>Land</u>"), together with all rights, outlots, easements and interests appurtenant thereto, if any, including, but not limited to, any streets or other public ways adjacent to the Land and any water or mineral rights.  Seller makes no representations or claims as to ownership interests in any public streets, other public ways, or water and mineral rights.

    **(ii)**    **Improvements**.  All buildings, improvements, fixtures and structures now or hereafter located on the Land (the "<u>Improvements</u>").

(iii)    **Leases.**    Seller's interest as landlord under the leases and guaranties relating thereto described on Exhibit B (each a "Lease" and collectively, the "Leases").

(iv)    **Personal Property.**    All personal property and other tangible property, now or hereafter located on the Land or in the Improvements and owned by Seller and used in connection with the Property (the "Personal Property") but shall not include personal property owned by tenants.

(v)    **Appurtenances.**    All rights, title and interest of Seller, if any, in all privileges, easements and appurtenances relating to the Land and the Improvements, including, without limitation (1) mineral, mining and water rights, (2) development rights and air rights, (3) easements, rights-of-way and other appurtenances used or connected with the beneficial use or enjoyment of the Land and the Improvements, including, without limitation, (i) access to a public way, (ii) right, title and interest in and to any land lying in the bed of any street, road or avenue opened or proposed, appurtenant to, abutting or adjoining the Land, to the center line thereof, (iii) right, title and interest in and to any award made or to be made in lieu thereof, and in and to any unpaid award for damage to the Land by reason of change of any grade of any street and (iv) any certificates of occupancy, special exceptions, variances or site plan approvals or other authorizations issued or granted by any governmental authority (collectively, the "Appurtenances").

(vi)    **Additional Rights.**    Intangible property, if any, including without limitation all construction documents, site plan, surveys, studies, plans and specifications and other personal and intangible property utilized in connection with the Land, architectural plans, third party engineering and inspection reports, guarantees and warranties pertaining to construction at the Land, utility rights, assignable licenses, governmental permits and authorizations and approvals issued by governmental authorities pertaining to the Land ("Additional Rights").

The Land, Leases, Personal Property, Improvements, Appurtenances and Additional Rights are sometimes hereafter collectively referred to as the "Property."

## ARTICLE 2
## PURCHASE PRICE

The purchase price (the "Purchase Price") for the Property is estimated to be TWENTY-TWO MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($22,500,000.00), payable by Purchaser to Seller as follows;

(A)    **Deposit.**    Within five (5) Business Days after the Effective Date Purchaser shall wire the sum of TWO HUNDRED AND FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00) (together with interest earned thereon, the ("Initial Deposit") to an account designated by Chicago Title Insurance Company in Chicago, Illinois ("Escrowee"). Purchaser shall wire an additional sum of TWO HUNDRED AND FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00) (the "Additional Deposit") upon completion or waiver of the Inspection Period. For purposes of this Agreement, "Business Day" shall mean any day of the week other than (i) Saturday and Sunday, or (ii) a day on which banking institutions in Chicago, Illinois is obligated or authorized by law or executive action to be closed to the transaction of

normal banking business. The Initial Deposit and the Additional Deposit, together with all interest earned thereon, are collectively referred to as the "Deposit". The Purchaser shall deposit the Initial Deposit and the Additional Deposit with Chicago Title Insurance Company (also known as "Escrowee"). Escrowee shall hold the Deposit in accordance with the terms and conditions of its standard Strict Joint Order Escrow Agreement, attached hereto as Exhibit " " and incorporated herein by reference, which shall be signed by Seller and Purchaser. Upon expiration or waiver of the Inspection Period the Deposit shall be non-refundable other than in the case of a Seller default, failure of a condition to close or occurrence of any other event under the terms of this Agreement requiring the return of the Deposit to Purchaser.

(B)     **Balance of Purchase Price**. On the Closing Date (as hereinafter defined), the Purchase Price allocable to the Property closing on the Closing Date (as determined pursuant to Section 3.1) less the Deposit, and subject to adjustment and proration pursuant to <u>Article 8</u> below, shall be paid by electronic wire transfer of immediately available federal funds pursuant to wiring instructions to be given by Escrowee or as Escrowee may direct to Purchaser prior to the Closing. Any interest earned on the Deposit shall be credited to Purchaser against the Purchase Price at the Initial Closing.

## 2.2     <u>Deposit Provisions</u>.

(A)     Upon the Closing, Escrowee is authorized and directed to pay the Deposit to Seller (or as Seller may direct) by the method of payment instructed by Seller.

(B)     Upon receipt by Escrowee prior to the end of the Inspection Period (as hereinafter defined) of notice from Purchaser to Seller stating that Purchaser has terminated this Agreement pursuant to its rights under the Inspection Period, Escrowee shall deliver the Deposit to Purchaser. Upon receipt of the Deposit, Purchaser shall acknowledge in writing, that the Deposit was refunded and received by Purchaser.

(C)     Upon receipt of a written notice from Purchaser, stating that Purchaser is entitled under this Agreement to the return of the Deposit (other than as set forth in subparagraph (B) above) and demanding payment of the same, Escrowee shall deliver the Deposit to Purchaser, subject, however, to the conditions set forth in subparagraph (F) below.

(D)     Escrowee shall invest and reinvest the proceeds of the Deposit, and any interest earned thereon, in United States Government Treasury Bills or Certificate(s) of Deposit or bank money market account(s) as Purchaser shall direct. The Purchaser shall be entitled to receive all interest earned on the Deposit, if any, and shall pay the investment fee and all income taxes owed in connection with any interest on the Deposit.

(E)     Escrowee, by signing this Agreement at the end hereof where indicated, signifies its agreement to hold the Deposit for the purposes as provided in this Agreement. In the event of any dispute, Escrowee shall have the right to deposit the Deposit in court to await the resolution of such dispute. Escrowee shall not incur any liability by reason of any action or non-action taken by it in good faith or pursuant to the judgment or order of a court of competent jurisdiction. Escrowee shall have the right to rely upon the genuineness of all certificates, notices and instruments delivered to it pursuant hereto, and all the signatures thereto or to any other writing received by Escrowee purporting to be signed by any party hereto, and upon the truth of the contents thereof.

(F)     Except as otherwise provided for in this Section 2.2 or 4.3, Escrowee shall not pay or deliver the Deposit to any party unless written demand is made therefor and a copy of such written demand is delivered to the other party.  If Escrowee does not receive a written objection from the other party to the proposed payment or delivery within two (2) Business Days after such demand is delivered to such party, Escrowee is hereby authorized and directed to make such payment or delivery.  If Escrowee does receive such written objection within such two (2) Business Day period or if for any other reason Escrowee in good faith shall elect not to make such payment or delivery, Escrowee shall forward a copy of the objections, if any, to the other party or parties, and continue to hold the Deposit unless otherwise directed by written instructions from the parties to this Contract or by a judgment of a court of competent jurisdiction.  In any event, Escrowee shall have the right to refrain from taking any further action with respect to the subject matter of the escrow until it is reasonably satisfied that such dispute is resolved or action by Escrowee is required by an order or judgment of a court of competent jurisdiction.

(G)     In the event of a dispute between Seller and Purchaser regarding the disposition of the Deposit, Escrowee shall be entitled to consult with counsel in connection with its duties hereunder. Seller and Purchaser, jointly and severally, agree to reimburse Escrowee, upon demand, for the reasonable costs and expenses including attorneys' fees incurred by Escrowee in connection with its acting in its capacity as Escrowee.  In the event of litigation relating to the subject matter of the escrow, whichever of Seller or Purchaser is not the prevailing party shall reimburse the prevailing party for any costs and fees paid by the prevailing party or paid from the escrowed funds to Escrowee.

### ARTICLE 3
### CLOSING

3.1     **Closing**. Subject to any adjournments expressly allowed in this Agreement, the closing of title (the "Closing") shall take place on or before February 28, 2019.  If Closing does not occur on February 28, 2019, the next set Closing Date shall be required to be the last day of a month.  Purchaser may postpone the Closing Date in accordance with the terms and conditions below, each of which must be strictly complied with by Purchaser:

(A)  Purchaser shall provide a written notice ("Extension Notice") to Seller on or before such date that is five (5) business days prior to the Closing Date that Purchaser shall postpone the Closing Date to March 31, 2019;

(B)  Within two (2) business days of providing the Extension Notice, Purchaser shall increase the Deposit by Two Hundred Fifty Thousand and No/100ths Dollars ($250,000.00) which shall be non-refundable other than in the case of a Seller default, failure of a condition to close or occurrence of any other event under the terms of this Agreement requiring the return of the Deposit to Purchaser, but applied to the Purchase Price.  Upon satisfaction of each of these conditions, the Closing Date shall be March 31, 2019.

4

(C) The Closing shall take place by escrow deliveries to the Title Company (as hereinafter defined) (the actual date of Closing is herein referred to as the "Closing Date") pursuant to reasonably acceptable escrow instructions that will provide, among other things, that the transfer documents will be released only upon Escrowee being unconditionally and irrevocably authorized by Purchaser to disburse the Cash Balance to Seller or as Seller may direct.

## ARTICLE 4
## PURCHASER'S INSPECTION

4.1 **Deliveries by Seller.** Seller shall deliver to Purchaser for inspection copies of those documents and reports listed on Schedule I no later than ten (10) business days after the Effective Date (all documents, reports and materials delivered to Purchaser by or on behalf of Seller, collectively referred to as the "Due Diligence Materials").

4.2 **Access to the Property.** Until the close of business on January 29, 2019, Purchaser and its agents, engineers, surveyors, appraisers, auditors and other representatives (collectively, "Purchaser's Representatives") shall have the right to reasonable access to enter upon the Property, provided that such access shall be during normal business hours upon not less than FORTY-EIGHT (48) hours prior written notice, subject to tenants' rights under the Leases and applicable Laws and shall not unreasonably interfere with the use, occupancy, management or operation of the Property or any portion thereof by Seller, or its tenants and licensees, and provided that Seller shall have the right to have a representative present in connection with Purchaser's access to the Property, to inspect, examine, survey, obtain engineering inspections, soil analyses and environmental studies, including but not limited to Phase 1 reports, appraise, and otherwise do that which, in the opinion of Purchaser, is necessary to determine the boundaries, acreage and condition of the Property (including, without limitation, inspect, review and copy any and all documents in the possession or control of Seller, its agents, contractors or employees, and which pertain to the construction, ownership, use, occupancy or operation of the Property or any part thereof). Purchaser shall be allowed only one complete inspection of all 192 units. Nothing herein shall be construed as restricting Buyer from making additional inspections of individual units after the one complete inspection is completed. Purchaser agrees to indemnify and hold the Sellers harmless from and against any charges, liens, or liability with regard to physical injury to person and property damaged caused by any and all such physical on-site testing on the Property. Purchaser shall deliver to Seller, prior to any entry onto the Property, certificates of insurance issued by reputable insurers authorized to do business in the State of Illinois evidencing commercial general liability insurance, adding Seller as an additional insured, on an occurrence basis with limits of not less than Two Million Dollars ($2,000,000.00) per occurrence and Three Million Dollars ($3,000,000.00) in the aggregate, as well as Three Million Dollars ($3,000,000.00) per occurrence umbrella/excess liability coverage, including contractual liability coverage with respect to Purchaser's indemnity obligations as set forth in this Agreement. Additionally, with respect to any of the Purchaser Representatives performing environmental assessments, Purchaser shall have provided environmental legal liability insurance with limits of at least Two Million Dollars ($2,000,000.00) per claim. Purchaser shall have the right to review all Leases, Lease files and correspondence with Tenants currently at the Property. Also, Seller shall make all Seller's books, files and records relating in any way to the Property available for examination by Purchaser and Purchaser's agents and representatives, who shall have the right to make copies of such books, files and records and to extract therefrom such information as they may desire, and who shall have the right to audit and to have certified, thoroughly and completely, all income and expenses, profits and losses, and operational results of the Property for the two (2) calendar years prior to the Closing Date and for the current calendar year to date. During the Inspection Period, the Seller shall cooperate and complete, or cause their agents, contractors or employees to complete, such surveys or questionnaires requested by

Purchaser which will enable the Purchaser to identify (i) the kind and extent of the services or facilities provided at the Property and (ii) the sources of rental income at the Property.

4.3 **Right of Inspection and Termination.** As used in this Agreement, the term "Inspection Period" means the period commencing on the Effective Date and ending at 6:00 p.m. Central Time on January 29, 2019. In the event Purchaser is not satisfied with the results of its review of any Building for any reason or no reason, Purchaser shall deliver to Seller (with a copy to Escrowee), on or prior to the expiration of the Inspection Period, written notice of Purchaser's election to terminate this Agreement with respect to the entire Property (a "Termination Notice"). In the event Purchaser is satisfied with the results of its review of the Property, Purchaser shall deliver to Seller (with a copy to Escrow Agent), on or prior to the expiration of the Inspection Period, written notice of Purchaser's election to proceed with the transaction contemplated by this Agreement (a "Notice to Proceed"). In the event Purchaser fails to deliver either a Termination Notice or a Notice to Proceed to Seller on or prior to the expiration of the Inspection Period, then Purchaser shall be deemed to have elected to terminate this Agreement, and, upon request of Seller, Purchaser shall promptly execute and deliver to Seller a written acknowledgement of termination. Upon timely receipt of a Termination Notice by Seller, or upon Purchaser's being deemed to have elected to terminate the Agreement for failure to timely deliver a Notice to Proceed, the Deposit will be promptly refunded in full to Purchaser by the Escrowee. Thereupon this Agreement shall be terminated and the parties will be released from all further obligations under this Agreement except for provisions that expressly survive termination.

## ARTICLE 5
## TITLE AND SURVEY

5.1 Title.

(A) **Title Commitment.** Seller shall provide an existing title commitment and promptly order an updated commitment for the title insurance policy (the "Title Commitment") from Chicago Title Insurance Company in Chicago, Illinois, (the "Title Company"), which Title Commitment shall include, if available, specimen endorsements of the Title Endorsements (as defined in Section 9.2.(C) hereof), and the Seller shall instruct the Title Company to deliver a copy to Purchaser and the Seller. Purchaser shall notify the Seller within ten (10) Business Days of Purchaser's receipt of the updated Title Commitment of any defects, encumbrances, encroachments or other objections to title that are not acceptable to Purchaser. Any defects, encumbrances, encroachments or other objections to title that are not objected to within such ten (10) Business Day period in accordance with the prior sentence shall also be deemed "Permitted Exceptions."

(B) **Status of Title.** At the Closing, Seller shall deliver and Purchaser shall accept title to the Property and consummate the transaction contemplated by this Agreement subject to (a) title exceptions created by Purchaser, and (b) the title exceptions deemed Permitted Exceptions under Section 5.1(A) above (the title exceptions described in (a) and (b) herein sometimes referred to collectively as the "Permitted Exceptions"). As a condition to Purchaser's obligations under this Agreement, the Title Company shall issue to Purchaser an ALTA extended coverage owner's title insurance policy, with coverage in an amount not less than the Purchase Price, which title policy may consist of a marked title commitment, with an extended coverage endorsement deleting all of the standard exceptions, and the Title Endorsements, insuring as of the Closing Date that title to the Property is vested in Purchaser as of the date of recording of the Deed, subject only to the Permitted Exceptions, which title insurance policy shall be effective as of the Closing Date (the "Title Policy"). Seller shall be responsible to pay the premiums charged

6

by the Title Company for the Title Commitment and Title Policy, including search and exam fees, and those endorsements required to cure title exceptions that Seller is obligated to remove pursuant to this Article 5, and Purchaser shall be responsible to pay the premiums charged for the Title Endorsements and all other endorsements to the Title Policy requested by Purchaser. The Seller and Purchaser shall deliver to the Title Company all affidavits and undertakings reasonably requested by the Title Company for the issuance of the Title Policy.

(C)     **Non-Permitted Title Objections**. If on the date scheduled for Closing it should appear that the Property is affected by any lien, encumbrance, defect, encroachment or objection which is not a Permitted Exception (collectively, "Non-Permitted Title Objections"), then in such event, Seller shall have the obligation to remove or satisfy the same in a manner reasonably acceptable to Purchaser, and shall, for that purpose, be entitled to one or more adjournments of the Closing for a period not to exceed thirty (30) days beyond the date scheduled for Closing.

Seller agrees to remove or discharge any judgment liens filed against the Seller or any other monetary lien created by Seller or any other Non-Permitted Title Objection which can be removed or discharged by payment of a liquidated sum of money and any Non-Permitted Title Objections created by Seller after the date hereof.

5.2     **Survey**.

(A)     **Survey**. Seller shall provide a copy of an existing survey. Seller shall order and deliver to Purchaser an ALTA survey for the Property made in compliance with and meeting the accuracy standards under the "2016 Minimum Standard Detail Requirements for ALTA/ACSM Land Surveys" jointly established by the American Land Title Association and the National Society of Professional Surveyors and, as determined by Purchaser, containing Table A Optional Survey Responsibilities and Specifications 1, 2, 3, 4, 6(b), 7(a), 7(b)(1), 7(c), 8, 9, 10(a), 11, 13, 14, 16, 18 and 19, and containing the standard ALTA certification, which certification shall be directed to Purchaser, Seller and the Title Company, and to such other persons having an interest in the Property which Purchaser may designate (the "Survey(s)"). Purchaser agrees to provide all information necessary for the requested certifications in a timely manner.

(B)     **Survey Objections**. Purchaser shall notify Seller within ten (10) Business Days of Purchaser's receipt of any Survey(s) and Title Commitment of such objections as Purchaser may have to anything contained in the Survey ("Survey Objections"), and such Survey Objections shall be deemed Non-Permitted Title Objections and shall be subject to the terms and provisions of Section 5.1(C) hereof.

(C)     **Existing Surveys**. If requested by Purchaser's lender, Seller shall provide copies of existing Survey(s) for the Property(ies) and affidavits of no new improvements.

**ARTICLE 6**
**REPRESENTATIONS**

6.1    <u>Representations of the Seller</u>.

(A)    Trust represents, and Beneficiary represents, and Purchaser that the following statements are true, complete and correct as of the Effective Date and as of the Closing Date:

(i)    Trust is a land trust, duly organized, validly existing and authorized to do business in the State of Illinois. Beneficiary is a corporation, duly organized, validly existing and authorized to do business in the State of North Dakota.

(ii)    Trust and Beneficiary each has the power and authority to execute and deliver this Agreement and all Closing deliveries contemplated hereby, and has taken all actions and received all necessary consents and authorizations required for the consummation of the transaction contemplated herein and to perform its obligations under this Agreement.

(iii)

(a)    True, correct and complete copies of all Leases, including all agreements, amendments, guarantees, side letters and other documents relating thereto, have been delivered to Purchaser. The Leases are in full force and effect. The Leases constitute the only leases, licenses, guaranties or other agreements for the use or occupancy of the Property. Other than the Leases, there are no other leases, licenses, concessions or other written or oral agreements for the use or occupancy of the Property. To the best of Seller's knowledge, none of the Leases contain any arrangements under which the Seller or any of their affiliates shares, directly or indirectly, in the profits of any Tenant.

(b)    To the best of Seller's knowledge, the information on the rent roll attached hereto as <u>Exhibit C</u> is true, correct and complete.

(c)    All tenants or other parties (collectively, the "Tenants") under the Leases are in possession of their respective property. All rents are being paid and are current, except as otherwise set forth in <u>Exhibit C</u> (as the same may be updated as of the Closing Date).

(d)    Except as set forth in <u>Exhibit C</u>, (a) no Tenant has paid any rent, fees, or other charges for more than one month in advance which would result in any Tenant's ability to credit such advance payment against any payment due by Tenant after the Closing Date, or (b) is any Tenant entitled to any free rent, abatement of rent or similar concession.

(e)    Except as set forth in <u>Exhibit C</u>, no Tenant has contested any amounts payable under its Lease.

(f)    No brokerage commission or other compensation is payable (or will, with the passage of time or occurrence of any event, or both, be payable) with respect to any Lease, except as set forth on <u>Exhibit C</u>.

8

(g)     All work required to be performed by Seller in connection with the Leases has been completed and fully paid for and unconditionally accepted by the Tenants, except as set forth on Exhibit C;

(h)     All representations on the part of the Seller contained in the Leases are true and correct.

(i)     Except as otherwise set forth in Exhibit C, there are no actions or proceedings pending or threatened by any Tenant against any Seller under any Lease.

(j)     Exhibit C sets forth all security deposits held by Seller.

(k)     Except for the matters and information set forth on Exhibit C, Seller has not sent out any notice of default to any Tenant nor has Seller received any notice of default from any Tenant

(iv)     True, correct and complete copies of all service or maintenance contracts or management agreements to which Seller or any of its affiliates is a party (written or oral, the "Service Contracts") relating to or affecting the Property are set forth in Exhibit D annexed hereto and made a part hereof together with a true, correct and complete copies of all amendments, guarantees, side letters, and other documents relating thereto which are in full force and effect and have been previously delivered to Purchaser.  To the best of Seller's knowledge, all services that Seller or any of their affiliates provides to any Tenant not evidenced by a Service Contract is specifically set forth on Exhibit D.  No event has occurred that would constitute a default under any Service Contract.  No notice of default has been issued under any Service Contract and the fees and other charges described in the Service Contracts have been paid on a current basis through the date of this Agreement.  Notwithstanding anything contained herein to the contrary, Purchaser shall notify Seller in writing prior to the expiration of Inspection Period which, if any, except for the laundry lease,scavenger service, Comcast cable and ADS elevator alarm service of the Service Contracts Purchaser does not wish to assume at Closing. In the case of Contracts which contain a termination right by Seller, Seller shall exercise the termination rights upon the waiver or termination of the Due Diligence period so as to minimize any time frame by which Buyer shall be obligated under such Contract (unless Purchaser notifies Seller otherwise during the Due Diligence Period).

(v)     To the best of Seller's knowledge, the current use and occupation of any portion of the Property does not violate any of, and, where applicable, is in material compliance with, any laws, any applicable deed restrictions or other covenants, restrictions or agreements (including, without limitation, any of the Permitted Exceptions).

(vi)     To the best of Seller's knowledge, there are no contemplated improvements affecting the Property that may result in special assessments affecting the Property; without limiting the generality of the foregoing, the Property is not subject to any lien of any homeowners, landowners or other association having a common purpose except as set forth on Exhibit K.

(vii)   To the best of Seller's knowledge, there are no violations of any laws, codes, ordinances or statutes applicable to the Property.

(viii)   All of the Personal Property not owned by the tenants, is owned by the Seller free and clear of any liens or encumbrances and all other exceptions and encumbrances which are required by this Agreement to be removed at or prior to the Closing shall be removed.

(ix)

(a)   To the Seller's knowledge, the Property and Seller have been and are in compliance with, and have no liability or obligation arising under any Hazardous Materials (as hereinafter defined) on the Property in violation of Hazardous Substance Laws (as hereinafter defined), and neither Seller nor any of its representatives or agents has received any summons, citation, directive, order, claim, investigation, communication or other action from the United States Environmental Protection Agency or any other governmental authority seeking any information or alleging any violation of such Hazardous Substance Laws;

(b)

(1)   To the Seller's knowledge, Seller has not caused or permitted all or any part of the Property to be used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce or process any Hazardous Materials (as hereinafter defined) or other elements, compounds, mixtures, solutions of substances, except in compliance with all Hazardous Substance Laws;(2) To the Seller's knowledge, neither Seller nor any Tenant or other occupant of the Property have caused or permitted, nor have any knowledge of, any release, spill, leak, emittance, discharge, leaching, seeping, draining or dumping of any Hazardous Materials on-site emanating from the Property;(c)       The obligations of the Seller hereunder shall not be diminished, and the rights of Purchaser shall not be waived, by any activities of Purchaser, its agents or employees, to comply with such laws or regulations, including clean-up activities, payment of moneys, and so on, voluntary or otherwise.(d)  For purposes of this Agreement, the terms:(1)    "Hazardous Material" means the collective meanings given to the terms "hazardous material", "hazardous substances" and "hazardous wastes" in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601 et seq., as amended, Resource Conservation and Recovery Act 42 U.S.C. Section 6901 et seq., as amended, Federal Water Pollution Control Act 33 U.S.C. Section 1251 et seq., Oil Pollution and Control Act of 1990, and also shall include any meanings given to such terms in any similar federal, state or local statutes, ordinances, regulation or by-laws.  Without limiting the generality of the foregoing, the term "Hazardous Material" shall include oil and any other substance known to be hazardous, such as hazardous waste, lead-based paint, asbestos, methane gas, radon gas, urea formaldehyde insulation, oil, underground storage tanks, polychlorinated biphenyls ("PCBs"), toxic substances or other pollutants; and

10

(2)     "Hazardous Substance Laws" means any local, state or federal law or regulation relating to the use or disposition of Hazardous Material, including, without limitation, the Clean Air Act, the Federal Water Pollution Control Act, the Resource Conservation and Recovery Act, the Toxic Substance Control Act, the Safe Drinking Water Control Act, the Federal Comprehensive Environmental Response Compensation and Liability Act, the Hazardous Materials Transportation Act, and the Occupational Safety and Health Act, as the same may be amended from time to time.

(x)     The execution, delivery and performance of this Agreement by Seller and the Closing deliveries contemplated hereby shall not require the consent of any third-party.

(xi)     Seller has not received any notice from any insurance company insuring the Property to correct any deficiencies in the physical condition of the Property.

(xii)     Beneficiary represents, and covenants that 561 Deere Park Circle, L.P., is the sole beneficiary of the Trust and that Northridge Holdings, LTD, is its general partner and has sole power of direction under the Trustee.

## 6.2     **Representations of Purchaser.**

(A)     Purchaser hereby represents, warrants and covenants to Seller that Purchaser is duly organized, validly existing and qualified and empowered to conduct its business; has the power and authority to execute, deliver and comply with this Agreement and all Closing deliveries contemplated hereby, has taken all actions and received all necessary consents and authorizations required for the consummation of the transaction contemplated herein and to perform its obligations under this Agreement. Neither the execution and delivery of this Agreement nor its performance by Purchaser will conflict with or result in the breach of any contract, agreement, law, rule or regulation to which Purchaser is a party or by which Purchaser is bound. This Agreement is valid and enforceable against Purchaser in accordance with its terms and each instrument to be executed by Purchaser pursuant to this Agreement or in connection herewith will, when executed and delivered, be valid and enforceable against Purchaser in accordance with its terms.

(B)     EXCEPT AS IS EXPRESSLY PROVIDED IN THIS AGREEMENT OR IN ANY INSTRUMENT OR OTHER DOCUMENT DELIVERED AT CLOSING, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE PHYSICAL CONDITION OR ANY OTHER ASPECT OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, (I) THE CONFORMITY OF THE IMPROVEMENTS TO ANY PLANS OR SPECIFICATIONS FOR THE PROPERTY (INCLUDING, BUT NOT LIMITED TO, ANY PLANS AND SPECIFICATIONS THAT MAY HAVE BEEN OR WHICH MAY BE PROVIDED TO PURCHASER), (II) THE CONFORMITY OF THE PROPERTY TO PAST, CURRENT OR FUTURE APPLICABLE ZONING, BUILDING, SUBDIVISION, LAND USE, HEALTH, SAFETY, ENVIRONMENTAL OR NONDISCRIMINATION LAWS, STATUTES, ORDINANCES, RULES, REGULATIONS, ORDERS, CODES OR OTHER LEGAL REQUIREMENTS OR WITH ANY PAST, PRESENT OR FUTURE DOCUMENTS OF RECORD, (III) THE AVAILABILITY OF PUBLIC UTILITIES AND SERVICES FOR THE PROPERTY, (IV) THE FITNESS OR SUITABILITY OF THE PROPERTY FOR PURCHASER'S INTENDED USE, (V) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE PROPERTY, (VI) THE EXISTENCE OF VESTED LAND USE, ZONING, BUILDING OR OTHER ENTITLEMENTS AFFECTING THE PROPERTY, OR (VII) THE PRESENCE OF TOXIC WASTES,

11

HAZARDOUS MATERIALS OR FRIABLE ASBESTOS IN, ON OR ABOUT THE PROPERTY (COLLECTIVELY, THE "PROPERTY CONDITIONS").

C.      <u>Purchaser's Financial Condition</u>.  No petition has been filed by or against Buyer under the Federal Bankruptcy Code or any similar state or federal Law.

D.      <u>Executive Order 13224</u>.  Neither Purchaser, nor any assignee of Purchaser, nor any Person holding any legal or beneficial interest whatsoever in Purchaser, or in any assignee of Purchaser, is included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the Persons referred to or described in Executive Order 13224 – Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended.

## ARTICLE 7
## COVENANTS

### 7.1    <u>Obligations and Covenants of the Seller.</u>

(A)    From and after the Effective Date, upon expiration or waiver of the Inspection Period and through and including the Closing Date, the Seller shall, at Seller's sole cost and expense:

(i)    Maintain and operate the Property in the same condition and manner as the Property is now maintained and operated;

(ii)    Promptly deliver to Purchaser a copy of any notice issued or received by Seller (including, without limitation, a notice of default) received under any mortgage or any Lease;

(iii)    Promptly deliver notice to Purchaser of all material correspondence, actions, suits, claims and other proceedings affecting the Property, or the use, possession or occupancy thereof or of any Damage or proposed Taking or of any violations of any Hazardous Substances Laws;

(iv)    Promptly deliver copies of notices to Purchaser of releases of Hazardous Material or any actual or threatened condemnation of the Property or any portion thereof given by or on behalf of any federal, state or local agency;

(v)    Maintain the current insurance policies on the Property;

(vi)    Cooperate fully with Purchaser in respect of any documents or information reasonably requested by Purchaser;

B.    From and after the Effective Date and through and including the Closing Date, Seller shall not permit any additional encumbrances on the Property other than general real estate taxes, nor enter into any operating agreements, licenses, covenant documents or easements for the Property.

C.    Upon expiration or waiver of the Inspection Period, and through and including the Closing Date, Seller shall not:

(i)    Enter into any Service Contracts or other contracts of Seller affecting the Property without Seller's prior consent, which consent shall not be unreasonably withheld, delayed or conditioned unless such contract (as so extended, renewed, replaced or modified) is terminable by the owner of the Property without penalty on not more than thirty (30) days' advance notice.;

(ii)    Permit a mechanic's lien or similar lien to be placed against the Property.

Prior to the expiration or waiver of the Inspection Period, Seller may continue to lease vacant residential units at the Property in accordance with Seller's reasonable judgment, and past practices, including without limitation adjustment of lease offering terms to respond to market conditions provided Seller sends updates of such leases to Purchaser prior to the expiration of the Inspection Period. Following the expiration or waiver of the Inspection Period, Seller shall continue to lease units on the Property. Notwithstanding the foregoing, Seller shall enter into no lease that is inconsistent with current market rates or that is made for a term to exceed ONE (1) year and shall continue to be in accordance with its established policies and procedures.

Purchaser shall be notified by Seller promptly of the occurrence of any of the following: fire or other casualty causing damage to the Property, or any portion thereof; receipt of notice of eminent domain proceedings or condemnation of or affecting the Property, or any portion thereof; receipt of notice from any governmental authority or insurance underwriter relating to the condition, use or occupancy of the Property, or any portion thereof, setting forth any requirements with respect thereto; receipt of any notice of default from the holder of any lien or security interest in or encumbering the Property, or any portion thereof; notice of any actual or threatened litigation against Seller or affecting or relating to the Property, or any portion thereof.

## ARTICLE 8
## APPORTIONMENTS

8.1    **Apportionments.**

A.    The following items shall be apportioned as of 11:59 PM of the day immediately preceding the Closing Date for the Property at Closing:

(i)    General real estate taxes, special taxes and assessments, water charges, sewer rents, levied against the Property for the current year shall be prorated based on the current year's bill or if not available on the basis of 105% of the last ascertainable real estate tax bill.

(ii)    Charges for water, sewer rents, electricity, steam, gas and telephone, which are not metered or otherwise charged directly to Tenants under the Leases; provided that if the consumption of any of such utilities is measured by meters, Seller on the Closing Date shall use reasonable efforts to furnish a current reading of each meter; and

provided, further, that if there is not a meter or if the current bill for any of such utilities has not been issued prior to the Closing Date, the charges therefore shall be adjusted on the basis of the charges for the prior period for which bills were issued and shall be further adjusted when the bills for the current period are issued;

(iii)    Seller and Purchaser shall maintain and make available to each other any books or records necessary for the adjustment of any item pursuant to this Article.

(iv)    Any delinquent rents shall not be accrued or prorated at Closing. Any rents collected by Seller or Purchaser after the Closing Date shall be applied (and with respect to rentals applied to the calendar month in which the Closing occurs, prorated) first to rentals due and payable for the calendar month in which the Closing occurs, if unpaid, then to any months subsequent to the month in which the Closing Date occurs, and then to any rents past due for the calendar month next preceding the calendar month in which the Closing Date occurs (the "Arrears").  Any rents collected by Seller after the Closing Date shall be immediately remitted to Purchaser to be applied first to the month of the Closing and prorated in accordance with the terms of Article 8, second, to any month subsequent to the Closing, and third, so long as such Tenant in arrears is current for rent arising after the Closing Date to the Arrears.  Any rents collected by Purchaser that are to be applied to the Arrears pursuant to the preceding sentence shall be held by Purchaser for the account of Seller, and, after deducting therefrom all reasonable third party expenses incurred in connection with the collection thereof, if any, Purchaser shall remit the same to the Seller.  **Seller shall** not commence a lawsuit against existing Tenants for Arrears.

B.    **Closing Costs**.  Seller shall pay for any and all State deed taxes and applicable transfer taxes, title insurance premiums for the Title Commitment and Title Policy with extended coverage and costs for the Survey(s).  Purchaser shall pay for the Title Endorsements (other than extended coverage).  All closing escrow fees shall be divided equally between Seller and Purchaser.  All other closing costs shall be paid according to local custom. Except as provided in Section 13.18 hereof, each party shall pay its own legal fees.

C.    **Schedule of Prorations**.  The parties shall endeavor to jointly prepare a schedule of prorations for the Property not less than three (3) Business Days prior to Closing.  If Seller has collected escalation payments for periods prior to Closing, whether pursuant to estimates which were in excess of or less than the amounts actually required to be paid, or otherwise, there shall be an adjustment and credit to Purchaser or Seller, as the case may be, at Closing for such excess.  As soon as final figures are available, the parties shall reprorate the amounts prorated herein.

D.    **Survival**.  This Article 8 shall survive the Closing and shall not merge with any Deed.

**ARTICLE 9**
**CONDITIONS PRECEDENT TO CLOSING**

9.1     **Seller's Conditions to Closing**.  Seller's obligation to close the transactions contemplated by this Agreement is conditioned on all of the following, any or all of which may be waived by Seller in writing, at its sole option:

A.     All representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects on and as of the Closing Date, as if made on and as of such date subject to any updates to the representations and warranties of which Purchaser notifies Seller after the Effective Date and which Seller has agreed to accept, as evidenced by Seller's election to proceed to the Closing.

B.     Purchaser shall have delivered the funds required hereunder for such Closing, and all of the documents required to be delivered by Purchaser pursuant to Section 10.2 and shall have performed in all material respects all of its other obligations hereunder required to be performed by the Closing Date, and complied in all material respects with all conditions required by this Agreement to be complied with by Purchaser at or prior to the Closing.

9.2     **Purchaser's Conditions to Closing**.  Purchaser's obligation to close the transactions contemplated by this Agreement is conditioned on all of the following, any or all of which may be waived by Purchaser in writing, at its sole option:

(A)     All representations and warranties made by Seller in this Agreement shall be true and correct in all material respects on and as of the Closing Date, as if made on and as of such date.

(B)     Seller has delivered all of the documents required to be delivered by Seller pursuant to Section 10.1 hereof and shall have performed in all material respects all of their covenants and other obligations hereunder required to be performed at or prior to the Closing and complied in all material respects with all conditions required by this Agreement to be complied with by Seller at or prior to the Closing.

(C)     The Title Company shall be irrevocably committed to issue the Title Policy insuring that fee simple title to the Property Closing is vested in Purchaser (or its designee or assignee) as of the Closing Date, subject only to the Permitted Exceptions, and including extended coverage over all general exceptions, and also including the following title endorsements or their current equivalents (collectively, the "Title Endorsements"): (i) tax parcel endorsement; (ii) contiguity endorsement; (iii) physical access endorsement; (iv) survey accuracy endorsement; (v) owner's comprehensive endorsement, (vi) ALTA 3.1 zoning endorsement, (vii) survey same-as endorsement; (viii) subdivision endorsement; and (ix) such other endorsements as may be reasonably requested by Purchaser as a result of its title and survey review as provided in Article 5 hereof.

D.     Seller shall deliver possession of the Property to Purchaser at Closing subject only to rights of possession set forth in the Leases on the rent roll for such Property and the rent roll to be delivered at Closing shall have no material deviations from Exhibit B.

15

9.3     **Failure of Condition**.  In the event that (i) any condition set forth in Section 9.1 above is not satisfied and is not waived by Seller, or (ii) any condition set forth in Section 9.2 above is not satisfied and is not waived by Purchaser, on or as of the date scheduled for Closing (or such earlier date provided for in such condition precedent), except as set forth in Article 11 to the extent such condition was not satisfied as a result of a default (in which event Article 11 shall govern), the sole right of Purchaser or Seller, as the case may be, shall be either to (a) terminate this Agreement by delivering written notice of such termination to the other party on or prior to the Closing, in which event the Deposit shall be returned to Purchaser, and in the event of a failure of a condition under Section 9.2, Seller shall reimburse Purchaser for all of its third party costs and expenses, and the parties shall have no further obligations or liabilities hereunder except as expressly provided hereunder, or (b) waive the satisfaction of such condition or conditions and proceed to Closing in accordance with and subject to the terms of this Agreement.

## ARTICLE 10
## CLOSING DELIVERIES

10.1     **Seller's Deliveries**.  At or before Closing, the Seller shall deliver the following, each executed, acknowledged and notarized, as applicable, by Seller or such other party as indicated below to the extent appropriate:

(A)     Any "as-built" plans and specifications, certificates of occupancy and permits for the Property, which may be in the possession of the Seller or its affiliates;

(B)     A Trustee's deed for the Property (the "Deed"), which Deed may provide for either Purchaser or Purchaser's designee provided such designee is controlled by Purchaser as the grantee thereunder;

C.     A bill of sale for the Property (the "Bill of Sale") for the Personal Property and the Intangible Property in the form of Exhibit F;

D.     The security deposits (by way of a credit to Purchaser in the amount of the security deposits);

E.     An updated rent roll dated as of the Closing Date and represented and certified by Seller to be true, correct and complete in all respects to the best of Seller's knowledge;

F.     All existing maintenance records, operating manuals, guarantees and warranties pertaining to the Property;

G.     All keys, combinations and security codes for all locks and security devices for the Property in the possession of Seller;

H.     A letter to each of the Tenants advising them of the change in ownership and management of the Property and the transfer of the security deposits and directing that rentals or other payments thereafter be paid to a payee designated by Purchaser, and otherwise complying with applicable law;

16

I. Assignment and assumption of leases and security deposits (the "Assignment and Assumption of Leases") for the Property from Seller in the form of Exhibit G;

J. Assignment and assumption of service contracts (the "Assignment and Assumption of Service Contracts") for the Property from Seller in the form of Exhibit H;

K. Notices to those entities providing services and utilities to the Property which Purchaser desires to retain;

L. FIRPTA Certificate from Seller in the form of Exhibit I;

M. A certificate of the Seller reaffirming its representations and warranties in the form of Exhibit J;

N. A standard affidavit to the Title Company and such additional customary documents as shall be required by the Title Company to issue the Title Policy;

O. Such evidence or documents as may reasonably be required by Purchaser or the Title Company evidencing the status and capacity of Seller and the authority of Seller and the person or persons who are executing the various documents on behalf of Seller in connection with the sale of the Property to Purchaser in accordance with the terms of this Agreement;

P. All transfer and other tax declarations for the Property as may be required by law in connection with the transactions contemplated by this Agreement (collectively, the "Transfer Tax Returns") duly executed and sworn to by Seller;

Q. A closing statement prepared in accordance with Article 8 hereof (the "Closing Statement"); and

R. Such additional customary documents as shall be reasonably required to consummate the transaction contemplated by this Agreement.

10.2 **Purchaser's Deliveries.** At or before Closing, Purchaser shall deliver the following, each executed, acknowledged and notarized, as applicable, by Purchaser or such other party as indicated below to the extent appropriate:

A. Immediately available federal funds sufficient to pay the Cash Balance (subject to apportionments and adjustments as set forth herein) and Purchaser's share of all escrow costs and closing expenses;

B. Assignment and Assumption of Leases;

C. Assignment and Assumption of Service Contracts;

D. Transfer Tax Returns;

17

E.    Closing Statement;

F.    Such additional customary documents as shall be reasonably required to consummate the transaction contemplated by this Agreement.

## ARTICLE 11
## DEFAULTS

11.1   **Seller's Default**.  If Seller shall default in performance of its obligations under this Agreement beyond any applicable grace, notice or cure periods, then Purchaser shall be entitled as its sole remedy, to (1) terminate this Agreement and require that Seller cause the return of the Deposit and reimburse Purchaser for its third party costs and expenses, in which event, except for those provisions expressly stated to survive the termination of this Agreement, the parties shall have no further rights or obligations hereunder., (2) waive the condition and proceed to close the Transaction, or (3) seek specific performance of this Agreement by Seller.  Buyer hereby waives all other remedies, including, without limitation, any other claim for monetary damages.  IN NO EVENT SHALL SELLER'S DIRECT OR INDIRECT PARTNERS, SHAREHOLDERS, OWNERS OR AFFILIATES, ANY OFFICER, DIRECTOR, EMPLOYEE OR AGENT OF THE FOREGOING, OR ANY AFFILIATE OR CONTROLLING PERSON THEREOF HAVE ANY PERSONAL LIABILITY FOR ANY CLAIM, CAUSE OF ACTION OR OTHER LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PROPERTY, WHETHER BASED ON CONTRACT, COMMON LAW, STATUTE, EQUITY OR OTHERWISE EXCEPT DUE TO FRAUD, OR INTENTIONAL MISCONDUCT BY SUCH INDIVIDUAL .

11.2   **Purchaser's Default**.  If Purchaser shall default in performance of its obligations hereunder by failing to close as set forth in this Agreement, the sole right of Seller at law or in equity shall be to recover and the sole liability of Purchaser at law or in equity shall be to pay liquidated damages in the amount of the Deposit, such amounts being fixed as such by reason of the fact that the actual damages to be suffered by Seller in such event are in their nature uncertain and unascertainable with exactness and because Purchaser would not have entered into this Agreement unless Purchaser was exculpated from personal liability as herein provided.  Seller shall not seek or obtain any money or other judgment against Purchaser or any disclosed or undisclosed partner, principal, officer, director, shareholder or employee of Purchaser or against the assets or estate of Purchaser or any of the foregoing persons, and Seller's sole recourse for payment of said amounts shall be to the Deposit.

## ARTICLE 12
## DESTRUCTION, LOSS OR DIMINUTION OF THE PROPERTY

12.1   **Destruction, Loss or Diminution of the Property**.  If, between the date hereof and the Closing Date, the Property is damaged by fire or natural elements, or other causes (the "Damage"), or the Property is taken or made subject to condemnation, eminent domain or other governmental acquisition proceedings (collectively, a "Taking") then the following procedures shall apply:

A.    If the cost of required repair or replacement related to or arising out of the Damage or if the value of the Taking is One Hundred Thousand and No/100 Dollars ($100,000.00) or less for the Property, Purchaser shall proceed to close and take the Property as diminished by such events, subject (in the event of Damage) to a reduction in the Purchase Price for such Property applied against the Purchase Price otherwise due at Closing, which reduction shall be equal to the full amount of the cost to repair or replace the Damage to the Property, but which shall not exceed One Hundred Thousand and No/100 Dollars ($100,000.00).

B.     If the cost of repair or replacement to or arising out of the Damage or if the value of a Taking is greater than One Hundred Thousand and No/100 Dollars ($100,000.00), then Purchaser, at its sole option, may elect either to: (i) terminate this Agreement with respect to such Property by written notice to Seller given at or prior to the Closing and receive the return of the Deposit if not previously credit to a Closing; or (ii) accept a reduction in the Purchase Price for the Property in the amount of the Damage or Taking (less the amount of any insurance proceeds or award received therefor), proceed to close under this Agreement and accept the Property as diminished by such event.  In the event that Purchaser elects to proceed with the Closing, at Closing, all insurance proceeds paid and all claims for insurance proceeds on account of the Damage shall be assigned to Purchaser by instruments of assignment and proofs of claim acceptable to Purchaser and its adjuster and all awards from a Taking shall be paid over to Purchaser and all claims for any such award shall be assigned to Purchaser.

C.     Notwithstanding the provisions of this Article 12 to the contrary, in the event the Taking or Damage is of such a nature that either: (A) any Tenant could terminate its lease due solely to the Taking or Damage; or (B) access to or visibility of the Property is materially and adversely affected; or (C) the available parking at the Property after the Taking or Damage is materially and adversely affected as to no longer comply with applicable zoning laws, then in lieu of any of Purchaser's other remedies under this Agreement, Purchaser may elect, within ten (10) days after receipt of such notice of the Taking or Damage, as applicable, to terminate this Agreement by written notice to Seller given at or prior to the Closing, in which event the Seller shall promptly return the Deposit to the Purchaser and the Seller and Purchaser shall have no further obligations hereunder except for those obligations which expressly survive such termination.

The cost of repair or replacement related to or arising out of the Damage shall be determined by Seller and Purchaser, or, if they are unable to agree, the cost of repair or replacement shall be determined by an independent engineer selected by two other engineers, one of whom shall be selected by Purchaser and the other to be selected by Seller.

## ARTICLE 13
## MISCELLANEOUS

13.1   **OFAC.**  Neither Purchaser nor any of its respective members, partners or shareholders (a) is listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury ("OFAC") pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (September 25, 2001) (the "Order"); (b) is listed on any other list of terrorists or terrorist organizations maintained pursuant to the Order, the rules and regulations of OFAC or any other applicable requirements contained in any enabling legislation or other Executive Orders in respect of the Order (the Order and such other rules, regulations, legislation or orders are collectively called the "Orders"); (c) is engaged in activities prohibited in the Order; or (d) has been convicted, pleaded *nolo contendere*, indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

Neither Seller nor any of its members, partners or shareholders (a) is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order; (b) is listed on any other list of terrorists or terrorist organizations maintained pursuant to the Order, the rules and regulations of OFAC or any other applicable requirements contained in any enabling legislation or other Executive Orders in respect of the Order; (c) is engaged in activities prohibited in the Order; or (d) has been convicted, pleaded nolo contendere, indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

13.2    **Notices.**  All notices or other communications required or provided to be sent by either party shall be in writing and shall be sent: (i) by United States Postal Service, certified mail, return receipt requested, (ii) by any nationally known overnight delivery service for next day delivery, (iii) by delivery in person or, (iv) by electronic mail in PDF format or its equivalent.  All notices must be given prior to 6:00 p.m. local time on a Business Day; otherwise, such notice shall be deemed to have been given on the next succeeding Business Day.  All notices shall be addressed to the parties at the addresses below:

| To Seller: | NORTHRIDGE HOLDINGS LTD |
| | Glenn C. Mueller |
| | President |
| | 1020 W. Fullerton Avenue |
| | Addison, IL 60101-4335 |

| with a copy to: | Roger A. Serpe |
| | Attorney at Law |
| | 730 E. Suffield Drive |
| | Arlington Heights, IL 60004 |
| | Telephone:     (219) 730-2800 |
| | Email:          roger.serpelaw@comcast.net |

| To Purchaser: | Brishette Pierson |
| | WARBURG EQUITIES, LLC |
| | 9501 W. 144TH Suite #304 |
| | Orland Park, IL 60462 |

| With a copy to: | TAFT STETTINIUS & HOLLISTER LLP |
| | 111 East Wacker Drive, Suite 2800 |
| | Chicago, Illinois 60601 |
| | Attn: Kathryn Kovitz Arnold, Esq. |
| | Telephone:     (312) 836-4031 |
| | Facsimile:      (312) 966-8469 |
| | Email:          karnold@taftlaw.com |

All notices sent by mail shall be deemed effectively given on the date that is three (3) Business Days after the date of such mailing. All notices personally delivered or sent by facsimile or email shall be deemed effectively given on the date of such delivery. Any notices delivered by a nationally known overnight delivery service shall be deemed effectively given the day after deposit with such carrier. The attorneys for the parties are hereby specifically authorized to give and to receive notice on behalf of their respective client.

13.3    Expenses of Transaction. Each party shall be solely responsible for its own expenses in connection with the transactions contemplated hereby, except as otherwise expressly provided herein.

13.4    Broker. Purchaser represents and warrants to Seller that it has not dealt with any broker other than Coldwell Banker ("Purchaser's Broker") in connection with this Agreement. Seller represents and warrants to Purchaser that it has dealt with American Realty Services ("Seller's Broker") in connection with this Agreement. Seller shall pay the brokerage fees according to the listing agreement with Seller's Broker at Closing. Seller and Purchaser shall indemnify and defend each other against any costs, claims and expenses, including reasonable attorney's fees, arising out of their breach of their respective parts of any representation or agreement contained in this <u>Section 12.4</u>. The provisions of this <u>Section 12.4</u> shall survive Closing or, if Closing does not occur, the termination of this Agreement.

13.5    <u>**Assignment.**</u> Seller shall not directly or indirectly assign any of its rights or obligations under this Agreement. This Agreement may be assigned in whole or in part by Purchaser to an affiliate of Purchaser.

13.6    <u>**Time.**</u> Time is of the essence of this Agreement.

13.7    <u>**Time Periods.**</u> In the event the time for performance of any obligation hereunder expires on a day that is not a Business Day, the time for performance shall be extended to the next Business Day.

13.8    <u>**Counterparts and Electronic Signatures.**</u> This Agreement may be executed in counterparts, each of which shall constitute an original, but all together shall constitute one and the same Agreement. Signatures to this Agreement, any amendment hereof and any notice given hereunder, executed and transmitted electronically in PDF format shall be valid and effective to bind the party so signing.

13.9    <u>**Governing Law.**</u> This Agreement and all questions of interpretation, construction and enforcement hereof, and all controversies hereunder, shall be governed by the applicable statutory and common law of the State of Illinois.

13.10    <u>**Captions.**</u> The captions at the beginning of the several paragraphs, respectively, are for convenience in locating the context, but are not part of the context.

13.11    <u>**Severability.**</u> In the event any term or provision of this Agreement shall be held illegal, invalid, unenforceable or inoperative as a matter of law, the remaining terms and provisions of this Agreement shall not be affected thereby, but each such term and provision shall be valid and shall remain in full force and effect.

13.12 **Prior Understandings.** This Agreement, the Exhibits and the Schedules attached hereto embody the entire contract between the parties hereto with respect to the Property and supersede any and all prior agreements and understandings, written or oral, formal or informal by and between Seller and Purchaser. No extension, changes, modifications or amendment to or of this Agreement, of any kind whatsoever, shall be made or claimed by Seller or Purchaser, and no notices of any extensions, changes, modifications, or amendments made or claimed by Seller or Purchaser shall have any force or effect whatsoever unless the same shall be in writing and fully executed by Seller and Purchaser.

13.13 **Like-Kind Exchange.** Purchaser and Seller agree and acknowledge that each of them shall have the right to seek to qualify the transaction contemplated herein as a like-kind exchange under Section 1031 of the Internal Revenue Code, as amended (the "Code"). In the event that either party (as applicable, the "Requesting Party") exercises its right under this Agreement to seek to qualify any such transaction contemplated herein as a like-kind transaction under Section 1031, the other party (the "Non-Requesting Party") agrees to cooperate reasonably in the exchange, at the Requesting Party's sole cost, expense and liability (whether before, at or after Closing), and execute any additional agreements which such requesting party reasonably determines to be necessary, and the non-requesting party reasonably approves, for the transaction or transactions represented by this Agreement to qualify as part of a like-kind exchange under Code Section 1031 either prior to or after Closing provided that (i) the non-requesting party incurs no additional liability, cost or expense; and (ii) the non-requesting party shall not be required to take title to any property other than the Property. Furthermore, except as provided in Section 13.5 hereof, each party expressly acknowledges and agrees that both party's rights under this Agreement are assignable herein as a like-kind exchange under the Code; provided, however, that any such assignment shall not release the assigning party from its obligations hereunder. The requesting party further agrees to indemnify and hold non-requesting free and harmless from any cost, expense or liability, including reasonable attorney fees, resulting from non-requesting party's participation in any such exchange for the benefit of requesting party. Notwithstanding the foregoing, (i) any exchange or proposed exchange (including any tax consequences to either party) shall be at the sole risk of the requesting party, (ii) no such exchange or proposed exchange shall delay or postpone Closing, and (ii) should requesting party fail for any reason to effect a tax deferred exchange as contemplated in this Section 13.13, then and in any such event, the purchase by requesting party of the Property shall be consummated in accordance with the terms and conditions of this Agreement as though the provisions of this Section 13.13 had been omitted herefrom, except that non-requesting shall be reimbursed and indemnified from resulting costs and expenses as provided in this Section 13.13. Nothing contained in this Section 13.13 shall release requesting party of any of its obligations or liabilities under this Agreement, whether arising before, at or after Closing.

13.14 **No Additional Undertakings.** Upon the Closing, Purchaser shall neither assume nor undertake to pay, satisfy or discharge any liabilities, obligations or commitments of Seller other than those specifically agreed to between the parties and set forth in this Agreement. In the event that Purchaser, in its sole discretion, elects to assume any of the obligations under any one or more of the Service Contracts, it shall so notify Seller, in writing, no later than the end of the Inspection Period.

13.15 **Undertakings by Seller and Purchaser.** Seller and Purchaser each agree to perform such other acts, and to execute, acknowledge and deliver, prior to, at or subsequent to Closing, such other instruments, documents and other materials as the other may reasonably request and as shall be necessary in order to effect the consummation of the transaction contemplated hereby and to vest title to the Property in Purchaser, Seller will, whenever and as often as it shall be reasonably requested so to do by Purchaser, and Purchaser will, whenever and as often as it shall be reasonably requested so to do by Seller, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all conveyances, assignments, correction instruments and all other instruments and documents as may be

reasonably necessary in order to complete the transaction provided for in this Agreement and to carry out the intent and purpose of this Agreement. This Section 13.15 shall survive the Closing and the delivery of the Deed.

13.16 **Attorneys' Fees.** If a dispute of any nature between Seller and Purchaser with respect to the interpretation or enforcement of this Agreement results in litigation, the prevailing party shall be entitled to recover reasonable costs and expenses including reasonable attorneys' fees and expenses, whether at the investigative, pretrial, trial or appellate level. The prevailing party shall be determined by the court based upon an assessment of which party's major arguments or position prevailed. The provisions of this Section 13.16 shall survive the Closing or termination of this Agreement.

13.17 **Confidentiality.** Each party agrees that it will hold in strict confidence all documents, materials and other information concerning the transaction contemplated hereby (whether obtained before or after the date of this Agreement), including, without limitation, the business terms contained herein. Such documents, materials, information and terms shall not be communicated to any third party (other than to a party's partners, counsel, accountants, financial advisors or lenders). The obligation of each party to treat such documents, materials, information and terms in confidence shall not apply to any information which: (i) is or becomes available to such party on a non-confidential basis from a source other than such party; (ii) is or becomes available to the public other than as a result of disclosure by such party or its agents; (iii) is required to be disclosed as part of the application for any permit or entitlements related to the project; or (iv) is required to be disclosed under applicable law or judicial process, but only to the extent it must be disclosed.

24012217.7.7

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

<u>SELLER</u>:

**Parkway Bank & Trust Co., as trustee under the provisions of a trust agreement dated January 19, 2006 and known as Trust # 14106**

**By:   NORTHRIDGE HOLDINGS, LTD**, a North Dakota Corporation

By:   _~Mueller_____
Name:   _GLENN MUELLER_____
Its:   _PRESIDENT_____

AND

**NORTHRIDGE HOLDINGS, LTD**, a North Dakota Corporation

By:   _Mueller_____
Name:   _GLENN MUELLER_____
Its:   _PRESIDENT_____

<u>PURCHASER</u>:

**WARBURG EQUITIES, LLC** a Delaware limited liability company

By:   _____
Name:   _Estevan Haikns_____
Its:   _Manager_____

With respect to <u>Section 2.2</u>:

**CHICAGO TITLE INSURANCE COMPANY**

By:   _____
Name:   _____
Its:   _____

**EXHIBIT A**

**THE PROPERTY**

**EXHIBIT B**

**LEASES**

**EXHIBIT C**

**RENT ROLL**

**EXHIBIT D**

**SERVICE CONTRACTS**

**EXHIBIT E**

INTENTIONALLY DELETED

**EXHIBIT F**

**BILL OF SALE**

_____ ("Seller"), in consideration of Ten and No/100 Dollars ($10.00), and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, does hereby sell, assign, transfer and set over to _____ ("Purchaser") all of its right, title and interest in and to the Personal Property and Intangible Property, if any, as such terms are defined in that certain Agreement of Purchase and Sale between _____ and _____ dated _____ in connection with the purchase and sale of _____.

To have and to hold the same unto Purchaser, its successors and assigns forever, Seller, does hereby bind itself and its successors to forever warrant and defend the title to the Personal Property unto Purchaser, its successors and assigns, against the lawful claims of all persons claiming by, through or under Seller. Seller represents and warrants to Purchaser that Seller owns the Personal Property free and clear of all liens, claims and encumbrances and has full right, power and authority to convey title thereto.

IN WITNESS WHEREOF, Seller has signed and sealed this bill of sale this ___ day of _____, 20___.

_____

_____

## EXHIBIT G

## ASSIGNMENT AND ASSUMPTION OF LEASES

THIS ASSIGNMENT AND ASSUMPTION OF LEASES AND SECURITY DEPOSITS, made as of the _____ day of _____, 20___ (the "Closing Date"), by and between _____ ("Assignor"), having an address at _____ and _____ ("Assignee"), having an address at _____.

## W I T N E S S E T H:

WHEREAS, Assignor is the owner of certain real property (the "Land") located in _____, _____, together with the Improvements, the Leases, the Personal Property, the Intangible Property and the Appurtenances (collectively, the "Property") (all capitalized terms not defined herein shall have the meanings ascribed to them in that certain Agreement of Purchase and Sale (the "Agreement"), dated as of _____, 20___ among Assignor and Assignee.

WHEREAS, in connection with the transfer and conveyance of the Property to Assignee: (a) Assignor desires to assign to Assignee all of Assignor' right, title and interest in and to the Leases and the Security Deposits described on Exhibit A, attached hereto and made a part hereof, and (b) Assignee desires to accept such assignment and to assume and perform all of Assignor' obligations under the Leases and with respect to the Security Deposits arising from and after the Closing Date.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

Assignor hereby assigns, conveys and sets over unto Assignee all of Assignor's right, title and interest as landlord in, to and under the Leases and the Security Deposits from and after the Closing Date, including, without limitation, all rent or other charges owing under the Leases.

Assignee hereby accepts the foregoing assignment, acknowledges receipt of the Security Deposits and assumes and agrees to perform all of the obligations of Assignor under the Leases and with respect to the Security Deposits arising from and after the Closing Date.

Assignor agrees to and hereby defend, indemnify and hold Assignee harmless from and against any and all losses, claims, demands, suits, expenses (including, without limitation, reasonable attorneys' fees and disbursements (whether or not incident to litigation) and court costs), damages, obligations and liabilities (including, without limitation, claims for personal injury, wrongful death or Property damage), direct, contingent or consequential, of any kind or nature, incurred by Assignee, caused by Assignor and arising or accruing with respect to the Leases and the Security Deposits for the period prior to the Closing Date during Assignor's ownership of the Property, except as shall arise from the willful misconduct or gross negligence

of Assignee, its agents or employees. Assignor's obligation to defend, indemnify and hold Assignee harmless shall include, without limitation, any obligation or liability to any tenant of the Property under such tenant's Lease with respect to (i) any audit or reconciliation of such tenant's proportionate share of common area maintenance expenses and taxes applicable to the Property for any year prior to the year in which the Closing occurs, and (ii) the initial construction of the Property and/or such tenant's premises including any tenant improvements allowances to be paid to such tenant.

Assignee agrees that, from and after the Closing Date, Assignee shall and hereby does defend, indemnify and hold Assignor harmless from and against any and all losses, claims, demands, suits, expenses (including, without limitation, reasonable attorneys' fees and disbursements (whether or not incident to litigation) and court costs), damages, obligations and liabilities (including, without limitation, claims for personal injury, wrongful death or Property damage), direct, contingent or consequential, of any kind or nature, incurred by Assignor, caused by Assignee and arising or accruing with respect to the Leases and the Security Deposits (to the extent the same are transferred to Assignee at Closing) for the period from and after the Closing Date during Assignee's ownership of the Property, except as shall arise from the willful misconduct or gross negligence of Assignor, their agents or employees; provided, however, that Assignee shall not be deemed to have assumed any liability directly or indirectly arising out of any transaction, event, circumstance, action, failure to act or occurrence of any sort or type which occurred, existed, was taken, permitted or begun prior to the date of closing except as shall arise from the willful misconduct or gross negligence of Assignee, its agents or employees.

Nothing contained herein shall affect (expressly or by implication) the rights and obligations of Assignee and Assignor under the Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed this Assignment and Assumption of Leases and Security Deposits as of the day and year first written above.

ASSIGNOR:

_____

ASSIGNEE:

_____

## EXHIBIT H

## ASSIGNMENT AND ASSUMPTION OF SERVICE CONTRACTS

THIS ASSIGNMENT AND ASSUMPTION OF SERVICE CONTRACTS, made as of the _____ day of _____, 20___ (the "Effective Date"), by and between _____, a _____ ("Assignor"), having an address at _____ and _____ ("Assignee"), having an address at _____

## W I T N E S S E T H:

WHEREAS, Assignor are the owner of certain real property (the "Property") located in _____ and known as _____; and

WHEREAS, in connection with the transfer and conveyance of the Property to Assignee: (a) Assignor desire to assign to Assignee all of Assignor' right, title and interest in and to those certain Service Contracts described on Exhibit A attached hereto and made a part hereof, and (b) Assignee desires to accept such assignment and to assume and perform all of Assignor' obligations under the Service Contracts arising from and after the date hereof (the "Effective Date").

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

Assignor hereby assigns, conveys and sets over unto Assignee all of Assignor' right, title and interest in, to and under the Service Contracts from and after the Effective Date.

Assignee hereby accepts the foregoing assignment, and assumes and agrees to perform all of the obligations of Assignor under the Service Contracts arising from and after the Effective Date.

Assignor agrees to and hereby defends, indemnifies and holds Assignee harmless from and against any and all losses, claims, demands, suits, expenses (including, without limitation, reasonable attorneys' fees and disbursements (whether or not incident to litigation) and court costs), damages, obligations and liabilities (including, without limitation, claims for personal injury, wrongful death or Property damage), direct, contingent or consequential, of any kind or nature, incurred by Assignee, caused by Assignor and arising or accruing with respect to the Service Contracts for the period prior to the Effective Date during Assignor' ownership of the Property, except as shall arise from the willful misconduct or gross negligence of Assignee, its agents or employees;.

Assignee agrees that, from and after the Effective Date, Assignee shall and hereby does defend, indemnify and hold Assignor harmless from and against any and all losses, claims, demands, suits, expenses (including, without limitation, reasonable attorneys' fees and disbursements (whether or not incident to litigation) and court costs), damages, obligations and liabilities (including, without limitation, claims for personal injury, wrongful death or Property damage), direct, contingent or consequential, of any kind or nature, incurred by Assignor, caused by Assignee and arising or accruing with respect to the Service Contracts for the period from and after the Effective Date during Assignee's ownership of the Property, except as shall arise from the willful misconduct or gross negligence of Assignor, its agents or employees.

Nothing contained herein shall affect (expressly or by implication) the rights and obligations of Assignee and Assignor under the Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed this Assignment and Assumption of Service Contracts as of the day and year first written above.

ASSIGNOR:

_____

ASSIGNEE:

_____

By: _____

## EXHIBIT I

### FIRPTA CERTIFICATION

Section 1445 of the Internal Revenue Code provides that a transferee, purchaser, of a United States real Property interest must withhold tax if the transferor, seller, is a foreign person.

To inform the transferee that the withholding of tax is not required upon the disposition of a United States real Property interest, _____, a _____ ("Seller") hereby certifies the following:

Seller is not a non-resident alien for purposes of U.S. income taxation;

The U.S. taxpayer identification number is _____;

The address of Seller is:  _____

_____

Seller is/is not a disregarded entity for income tax purposes;

The undersigned understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury, the undersigned declares that this certification, to the best of its knowledge and belief, is true, correct and complete.

Dated: _____, 20____

SELLER:

_____

By:

## EXHIBIT J

## REAFFIRMATION OF REPRESENTATIONS

**THIS REAFFIRMATION OF REPRESENTATIONS** ("Reaffirmation") is made as of this _____ day of _____, 2019, by _____, a(n) _____.

### WITNESSETH:

**WHEREAS**, that certain Agreement of Purchase and Sale dated as of _____, 2019 (the "**Purchase Agreement**") for that certain real property located at _____, with _____, individually, or his assignee, as seller, which seller's interest in said agreement was subsequently assigned by _____ to _____ (the "Seller") and _____, a(n) _____, who subsequently assigned its interest, as purchaser in said agreement to _____, a(n) _____ ("**Purchaser**"), pertaining to the purchase and sale of the property legally described on Exhibit A attached hereto and made a part hereof (the "Property"); and

**WHEREAS**, as a condition to the closing of the transaction contemplated under the Purchase Agreement, Purchaser is required to execute and deliver this Reaffirmation.

**NOW, THEREFORE**, for Ten Dollars ($10.00) in hand paid, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby certifies to Purchaser that all of the representations made by Seller pursuant to the Agreement are true and correct as of the date hereof. This Reaffirmation has been delivered by Seller to Purchaser pursuant to the terms of the Agreement and nothing herein contained is intended to modify the terms of the Agreement.

**IN WITNESS WHEREOF**, Seller has executed and delivered this Reaffirmation as of the day and year first above written.

a(n) _____

By: _____
Name: _____
Its: _____

**EXHIBIT A**

**LEGAL DESCRIPTION**

## EXHIBIT K

## SPECIAL ASSESSMENTS & LIENS

**SCHEDULE I**

**DUE DILIGENCE MATERIALS**

(1)    Copies of real estate tax bills and special assessments (if any), and payment status for the preceding two (2) full calendar years.

(2)    All covenants, conditions, restrictions and easements, and documents (recorded, unrecorded and pending) affecting title to or use of the Property.

(3)    Insurance claims submitted over the past five (5) years.

(4)    Copies of all written citations from any governmental entities pertaining to any uncured violations of any applicable laws, codes or demands for repair or compliance of same.

(5)    As-built plans and specifications for all improvements on the Property, including but not limited to site plans and floor plans in the possession of Seller and the latest survey.

(6)    Copies of all service contracts, equipment leases and management agreements, warranties or guarantees, licenses and permits.

(7)    A schedule listing all furniture, furnishings, fixtures, equipment and other personal property owned or leased by Seller located upon or used in the operations of the Property.

(8)    Copies of all executed leases, letters of intent and outstanding Landlord proposals.

(9)    List of all capital items completed during the previous three (3) year period.

(10)    All rental agreements, leases or other written agreements used in the operation of and pertaining to the Property.

(11)    All pending rental agreements, leases or other written agreements pertaining to the Property.

(12)    All of Seller's title report(s) for the Property.

(13)    All surveys in possession or control of Seller.

(14)    All drawings (both current and historical) pertaining to the Property.

(15)    All documentation relating to any landmark and/or historical designations pertaining to the Property.

(16)    All existing Phase I reports, reports, other environmental reports and assessments (including but not limited to any asbestos surveys and lead-based paint surveys), if any, and any previously commissioned engineering reports relating to the Property.

(17)    Financial reports showing actual capital expenditures and operating expenditures for each of the past two (2) years, as well as any documents pertaining to anticipated future operating expenses (including but not limited to an annual operating budget) pertaining to the Property.

(18)   Operating Statements, 2016, 2017

(19)   Trailing 12 Ending Current 2018 (YTD Month to Month Income and Expenses)

(20)   Current Rent Roll

(21)   2016/2017 Tax Returns

(22)   Utility Bills (12) Months

(23)   PURCHASER must have access to view all 192 units as agreed to in the Purchase and Sale Agreement.

(24)   Appraisal

(25)   PURCHASER must have access to lender with financing in place once the parties have signed the Purchase and Sale Agreement.

ANY AND ALL items requested (as per the parties' agreement) in Sellers possession.

## SECOND AMENDMENT TO
## AGREEMENT OF PURCHASE AND SALE

THIS SECOND AMENDMENT TO AGREEMENT OF PURCHASE AND SALE (this "Second Amendment") is dated as of February 6, 2019 (the "Effective Date"), and is entered into by and between **NORTHRIDGE HOLDINGS, LTD.**, a North Dakota corporation, and **PARKWAY BANK & TRUST COMPANY**, as Trustee under the provisions of a Trust Agreement dated January 19, 2006, and known as Trust #14106 (collectively, "Seller"), and **WARBURG EQUITIES, LLC**, a Delaware limited liability company ("Purchaser").

### RECITALS:

WHEREAS, Seller and Purchaser entered into that certain Agreement of Purchase and Sale dated January 14, 2019 (as amended by that certain Reinstatement Agreement and First Amendment to Agreement of Purchase and Sale dated January 28, 2019, the "Agreement"), for the sale and purchase of the real property located at 561-564 Deere Park Circle in Bartlett, Illinois, as more fully described in the Agreement; and

WHEREAS, Purchaser and Seller desire to amend the Agreement in certain respects as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby amend the Agreement as follows:

1.     Incorporation of Recitals/Defined Terms. The recitals set forth above are incorporated herein by this reference to the same effect as if the recitals were set forth herein verbatim. All terms not otherwise defined herein shall have the meanings set forth in the Agreement.

2.     Inspection Period. The Inspection Period is hereby extended to 6:00 p.m. Central Time on February 19, 2019.

3.     Additional Deposit. Purchaser shall deposit the Additional Deposit with Taft Stettinius & Hollister LLP ("Taft") no later than 6:00 p.m. Central Time on February 11, 2019. Seller acknowledges that Taft shall hold the Additional Deposit solely for the benefit of Purchaser and that Seller shall have no right to the Additional Deposit while it is in the possession of Taft. Upon the expiration or waiver of the Inspection Period, and provided that the Agreement has not been terminated by such time, Purchaser shall cause Taft to wire the Additional Deposit to Escrowee pursuant to Article 2 of the Agreement.

4.     Amended Agreement. Except as modified by this Second Amendment, the Agreement shall remain unchanged and in full force and effect. In the event of any inconsistency, conflict, or difference between the terms of the Agreement and the terms of this Second Amendment, the terms of this Second Amendment shall govern and control.

5.     Severability. If any provision in this Second Amendment shall, for any reason, be held invalid, illegal, or unenforceable in any respect, the invalidity, illegality, or unenforceability shall not

24280126.1

affect any other provision of this Second Amendment, and this Second Amendment shall be construed as if it had never contained the invalid, illegal, or unenforceable provision.

6.  Governing Law.  This Second Amendment shall be governed by, and construed under, the internal laws of the State of Illinois.

7.  Counterparts.  This Second Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, and when taken together shall constitute the entire agreement between the parties.

8.  Facsimile Signatures.  Signatures to this Second Amendment, any amendment hereof and any notice given hereunder, executed and transmitted by facsimile (or by copies of physically signed documents exchanged via email attachments in PDF format or equivalent) shall be valid and effective to bind the party so signing.  Each party agrees to deliver promptly an executed original of this Second Amendment with its actual signature to the other party upon request, but a failure to do so shall not affect the enforceability of this Second Amendment, it being expressly agreed that each party to this Second Amendment shall be bound by its own telecopied or electronically transmitted signature and shall accept the telecopied or electronically transmitted signature of the other party to this Second Amendment.

*(signatures on following page)*

**IN WITNESS WHEREOF**, the parties hereto have executed this Second Amendment as of the Effective Date.

**SELLER:**

**NORTHRIDGE HOLDINGS, LTD.,**
a North Dakota corporation

By: _~mueller~_
Name: _GLENN MUELLER_
Title: _PRESIDENT_

**PARKWAY BANK & TRUST COMPANY**, as Trustee under the provisions of a Trust Agreement dated January 19, 2006, and known as Trust #14106

By: **NORTHRIDGE HOLDINGS, LTD.,**
a North Dakota corporation,
its beneficiary

By: _~mueller~_
Name:

_GLENN MUELLER_
Title:

_PRESIDENT_

**PURCHASER:**

**WARBURG EQUITIES, LLC,**
a Delaware limited liability company

By: _~signature~_
Name: _~illegible~_
Title: _Mngr_

[Signature Page to Second Amendment to Agreement of Purchase and Sale]

## REINSTATEMENT AGREEMENT AND FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE

THIS REINSTATEMENT AGREEMENT AND FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE (this "First Amendment") is dated as of January 28, 2019 (the "Effective Date"), and is entered into by and between **NORTHRIDGE HOLDINGS, LTD.,** a North Dakota corporation, and **PARKWAY BANK & TRUST COMPANY,** as Trustee under the provisions of a Trust Agreement dated January 19, 2006, and known as Trust #14106 (collectively, "Seller"), and **WARBURG EQUITIES, LLC,** a Delaware limited liability company ("Purchaser").

### R E C I T A L S:

WHEREAS, Seller and Purchaser entered into that certain Agreement of Purchase and Sale dated January 14, 2019 (the "Agreement"), for the sale and purchase of the real property located at 561-564 Deere Park Circle in Bartlett, Illinois, as more fully described in the Agreement;

WHEREAS, Purchaser sent Seller a termination notice on January 25, 2019, with respect to the Agreement (the "Termination Notice"); and

WHEREAS, Purchaser and Seller desire to (1) reinstate the Agreement and (2) amend the Agreement in certain respects as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby reinstate and amend the Agreement as follows:

1.  Incorporation of Recitals/Defined Terms. The recitals set forth above are incorporated herein by this reference to the same effect as if the recitals were set forth herein verbatim. All terms not otherwise defined herein shall have the meanings set forth in the Agreement.

2.  Rescission of Termination Notice/Reinstatement. Purchaser agrees that the Termination Notice is hereby rescinded and Seller and Purchaser agree that the Termination Notice is no longer of any force or effect and that the Agreement is hereby reinstated.

3.  Initial Deposit. Seller and Purchaser acknowledge that the Initial Deposit has been deposited with and received by Escrowee and agree that Purchaser shall be deemed to have timely deposited the Initial Deposit with Escrowee pursuant to Article 2 of the Agreement.

4.  Inspection Period. The Inspection Period is hereby extended to 6:00 p.m. Central Time on February 4, 2019. Purchaser's right to access and enter upon the Property pursuant to Section 4.2 of the Agreement shall continue through the expiration of the Inspection Period.

5.  Amended Agreement. Except as modified by this First Amendment, the Agreement shall remain unchanged and in full force and effect. In the event of any inconsistency, conflict, or difference between the terms of the Agreement and the terms of this First Amendment, the terms of this First Amendment shall govern and control.

24234108.1

6. <u>Severability</u>. If any provision in this First Amendment shall, for any reason, be held invalid, illegal, or unenforceable in any respect, the invalidity, illegality, or unenforceability shall not affect any other provision of this First Amendment, and this First Amendment shall be construed as if it had never contained the invalid, illegal, or unenforceable provision.

7. <u>Governing Law</u>. This First Amendment shall be governed by, and construed under, the internal laws of the State of Illinois.

8. <u>Counterparts</u>. This First Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, and when taken together shall constitute the entire agreement between the parties.

9. <u>Facsimile Signatures</u>. Signatures to this First Amendment, any amendment hereof and any notice given hereunder, executed and transmitted by facsimile (or by copies of physically signed documents exchanged via email attachments in PDF format or equivalent) shall be valid and effective to bind the party so signing. Each party agrees to deliver promptly an executed original of this First Amendment with its actual signature to the other party upon request, but a failure to do so shall not affect the enforceability of this First Amendment, it being expressly agreed that each party to this First Amendment shall be bound by its own telecopied or electronically transmitted signature and shall accept the telecopied or electronically transmitted signature of the other party to this First Amendment.

*(signatures on following page)*

**IN WITNESS WHEREOF**, the parties hereto have executed this First Amendment as of the Effective Date.

**SELLER:**                                          **PURCHASER:**

**NORTHRIDGE HOLDINGS, LTD.,**                       **WARBURG EQUITIES, LLC,**
a North Dakota corporation                           a Delaware limited liability company

By: _____                      By: _____
Name: _____                       Name: _____
Title: _____                      Title: _____


**PARKWAY BANK & TRUST COMPANY**, as Trustee under the provisions of a Trust Agreement dated January 19, 2006, and known as Trust #14106

By:     **NORTHRIDGE HOLDINGS, LTD.,**
        a North Dakota corporation,
        its beneficiary


        By: _____
                                    Name:

_____
                                    Title:

_____


[Signature Page to Reinstatement Agreement and
First Amendment to Agreement of Purchase and Sale]

## REINSTATEMENT AGREEMENT AND THIRD AMENDMENT TO AGREEMENT OF PURCHASE AND SALE

THIS REINSTATEMENT AGREEMENT AND THIRD AMENDMENT TO AGREEMENT OF PURCHASE AND SALE (this "Third Amendment") is dated as of March 18, 2019 (the "Effective Date"), and is entered into by and between **NORTHRIDGE HOLDINGS, LTD.**, a North Dakota corporation, and **PARKWAY BANK & TRUST COMPANY**, as Trustee under the provisions of a Trust Agreement dated January 19, 2006, and known as Trust #14106 (collectively, "Seller"), and **WARBURG EQUITIES, LLC**, a Delaware limited liability company ("Purchaser").

### RECITALS:

WHEREAS, Seller and Purchaser entered into that certain Agreement of Purchase and Sale dated January 14, 2019 (as amended by that certain Reinstatement Agreement and First Amendment to Agreement of Purchase and Sale dated January 28, 2019, and by that certain Second Amendment to Agreement of Purchase and Sale dated February 6, 2019, the "Agreement"), for the sale and purchase of the real property located at 561-564 Deere Park Circle in Bartlett, Illinois, as more fully described in the Agreement; and

WHEREAS, Purchaser sent Seller a termination notice on March 8, 2019, with respect to the Agreement (the "Termination Notice"); and

WHEREAS, Purchaser and Seller desire to (1) reinstate the Agreement and (2) amend the Agreement in certain respects as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby amend the Agreement as follows:

1.  Incorporation of Recitals/Defined Terms. The recitals set forth above are incorporated herein by this reference to the same effect as if the recitals were set forth herein verbatim. All terms not otherwise defined herein shall have the meanings set forth in the Agreement.

2.  Rescission of Termination Notice/Reinstatement. Purchaser agrees that the Termination Notice is hereby rescinded and Seller and Purchaser agree that the Termination Notice is no longer of any force or effect and that the Agreement is hereby reinstated.

3.  Contingencies. Purchaser hereby waives the right of inspection and Inspection Period set forth in Section 4 of the Agreement.

4.  Article 2 Purchase Price Section (A) shall be deleted in its entirety and replaced as follows:

The purchase price (the "Purchase Price") for the Property is TWENTY-TWO MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($22,500,000.00), payable by Purchaser to Seller as follows:

24627992.3

(A)     Deposit.  Within one (1) Business Day after the full execution of this Third Amendment to Purchase and Sale Agreement Purchaser shall wire the sum of TWO HUNDRED AND FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00) (together with interest earned thereon, the ("Deposit") to an account designated by Chicago Title Insurance Company in Chicago, Illinois ("Escrowee") For purposes of this Agreement, "Business Day" shall mean any day of the week other than (i) Saturday and Sunday, or (ii) a day on which banking institutions in Chicago, Illinois is obligated or authorized by law or executive action to be closed to the transaction of normal banking business. The Deposit together with all interest earned thereon, are collectively referred to as the "Deposit". The Purchaser shall deposit the Deposit with Chicago Title Insurance Company (also known as "Escrowee"). Escrowee shall hold the Deposit in accordance with the terms and conditions of Section 2.2 Deposit Provisions of the Purchase and Sale Agreement.

5.     Section 2.2 is deleted in its entirety and replaced as follows:

Section 2.2     Deposit Provisions.

(A)     Upon either the Closing, or Purchaser's failure to Close on or before April 29, 2019, with Seller not being in default hereunder, Escrowee is authorized and directed to pay the Deposit to Seller (or as Seller may direct) by the method of payment instructed by Seller.

(B)     Upon receipt of a written notice from Seller, stating that Seller is entitled under this Agreement to receive the Deposit and demanding payment of the same, Escrowee shall deliver the Deposit to Seller.

(C)     Escrowee, by signing this Agreement at the end hereof where indicated, signifies its agreement to hold the Deposit for the purposes as provided in this Agreement.  In the event of any dispute, Escrowee shall have the right to deposit the Deposit in court to await the resolution of such dispute.  Escrowee shall not incur any liability by reason of any action or non-action taken by it in good faith or pursuant to the judgment or order of a court of competent jurisdiction.  Escrowee shall have the right to rely upon the genuineness of all certificates, notices and instruments delivered to it pursuant hereto, and all the signatures thereto or to any other writing received by Escrowee purporting to be signed by any party hereto, and upon the truth of the contents thereof.

(D)     In the event of a dispute between Seller and Purchaser regarding the disposition of the Deposit, Escrowee shall be entitled to consult with counsel in connection with its duties hereunder. Seller and Purchaser, jointly and severally, agree to reimburse Escrowee, upon demand, for the reasonable costs and expenses including attorneys' fees incurred by Escrowee in connection with its acting in its capacity as Escrowee.  In the event of litigation relating to the subject matter of the escrow, whichever of Seller or Purchaser is not the prevailing party shall reimburse the prevailing party for any costs and fees paid by the prevailing party or paid from the escrowed funds to Escrowee.

6.     Article 3 Closing is deleted in its entirety and replaced as follows:

3.1     Closing.  The closing of title (the "Closing") shall take place on or before April 29, 2019.

24627992.3

(A)    The Closing shall take place by escrow deliveries to the Title Company (as hereinafter defined) (the actual date of any closing is herein referred to as the "Closing Date") pursuant to reasonably acceptable escrow instructions.

7.    Article 4 Purchaser's Inspection is deleted in its entirety.

8.    Section 5.1 Title is deleted in its entirety and replaced as follows:

(A)    Title Commitment.  Seller has provided an existing title commitment and a revised Master Commitment for the title insurance policy (the "Title Commitment") from Chicago Title Insurance Company in Chicago, Illinois, (the "Title Company").  Purchaser has reviewed the revised Master Commitment and has accepted the commitment without objection and hereby designates all exceptions as Permitted Exceptions, subject to those items Seller has agreed to remove or have waived at Closing, as set forth on the correspondence attached hereto as Exhibit A.

(B)    Status of Title.  At the Closing, Seller shall deliver and Purchaser shall accept title to the Property and consummate the transaction contemplated by this Agreement subject to (a) title exceptions created by Purchaser, and (b) the title exceptions deemed Permitted Exceptions under Section 5.1(A) above (the title exceptions described in (a) and (b) herein sometimes referred to collectively as the "Permitted Exceptions").  As a condition to Purchaser's obligations under this Agreement, the Title Company shall issue to Purchaser an ALTA extended coverage owner's title insurance policy, with coverage in an amount not less than the Purchase Price, which title policy may consist of a marked title commitment, with an extended coverage endorsement deleting all of the standard exceptions, and the Title Endorsements, insuring as of the Closing Date that title to the Property is vested in Purchaser as of the date of recording of the Deed, subject only to the Permitted Exceptions, which title insurance policy shall be effective as of the Closing Date (the "Title Policy").  Seller shall be responsible to pay the premiums charged by the Title Company for the Title Commitment and Title Policy, including search and exam fees, and those endorsements required to cure title exceptions that Seller is obligated to remove pursuant to this Article 5, and Purchaser shall be responsible to pay the premiums charged for the Title Endorsements and all other endorsements to the Title Policy requested by Purchaser.  The Seller and Purchaser shall deliver to the Title Company all affidavits and undertakings reasonably requested by the Title Company for the issuance of the Title Policy.

(C)    Non-Permitted Title Objections.  If on the date scheduled for Closing it should appear that the Property is affected by any lien, encumbrance, defect, encroachment or objection which is not a Permitted Exception (collectively, "Non-Permitted Title Objections"), then in such event, Seller shall have the obligation to remove or satisfy the same in a manner reasonably acceptable to Purchaser, and shall, for that purpose, be entitled to one or more adjournments of the Closing for a period not to exceed thirty (30) days beyond the date scheduled for Closing.

9.    Section 5.2 Survey is deleted in its entirety and replaced as follows:

(A)    Survey.  Seller has provided a copy of an existing survey.  Seller has also delivered to Purchaser a current ALTA survey for the Property made in compliance with and meeting the accuracy standards under the "2016 Minimum Standard Detail Requirements for ALTA/ACSM Land Surveys" jointly established by the American Land Title Association and the National Society of Professional Surveyors and, as determined by Purchaser and containing the standard ALTA certification, which

certification shall be directed to Purchaser, Seller and the Title Company, and to such other persons having an interest in the Property which Purchaser has designated (the "Survey(s)").

(B)     Survey Objections.  Purchaser has reviewed the revised ALTA Survey and has accepted the Survey without objection, subject to those items Seller has agreed to have addressed on the Survey, as set forth on the correspondence attached hereto as Exhibit A.

10.     A new Section 8.2 shall be added to the Agreement as follows:

"Section 8.2   Closing Credit.  Seller shall provide to Purchaser at closing a $40,000.00 credit in lieu of any repair or maintenance identified or recommended pursuant to any inspection including but not limited to PCA recommendations and any Phase I remediation."

11.     Article 10, Closing Deliveries, shall be amended by adding the following:

(S)     Seller will provide necessary updates of previously provided information requested by lender prior to or at closing to the extent the information exists and is available.

12.     Amended Agreement.  Except as modified by this Third Amendment, the Agreement shall remain unchanged and in full force and effect.  In the event of any inconsistency, conflict, or difference between the terms of the Agreement and the terms of this Third Amendment, the terms of this Third Amendment shall govern and control.

13.     Severability.  If any provision in this Third Amendment shall, for any reason, be held invalid, illegal, or unenforceable in any respect, the invalidity, illegality, or unenforceability shall not affect any other provision of this Third Amendment, and this Third Amendment shall be construed as if it had never contained the invalid, illegal, or unenforceable provision.

14.     Governing Law.  This Third Amendment shall be governed by, and construed under, the internal laws of the State of Illinois.

15.     Counterparts.  This Third Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, and when taken together shall constitute the entire agreement between the parties.

16.     Facsimile Signatures.  Signatures to this Third Amendment, any amendment hereof and any notice given hereunder, executed and transmitted by facsimile (or by copies of physically signed documents exchanged via email attachments in PDF format or equivalent) shall be valid and effective to bind the party so signing.  Each party agrees to deliver promptly an executed original of this Third Amendment with its actual signature to the other party upon request, but a failure to do so shall not affect the enforceability of this Third Amendment, it being expressly agreed that each party to this Third Amendment shall be bound by its own telecopied or electronically transmitted signature and shall accept the telecopied or electronically transmitted signature of the other party to this Third Amendment.

*(signatures on following page)*

**IN WITNESS WHEREOF**, the parties hereto have executed this Third Amendment as of the Effective Date.

**SELLER:**

**NORTHRIDGE HOLDINGS, LTD.,**
a North Dakota corporation

By: _Mueller_
Name: GLENN MUELLER
Title: PRESIDENT

**PURCHASER:**

**WARBURG EQUITIES, LLC,**
a Delaware limited liability company

By: _____
Name: Gregory Perkins
Title: Manager

**PARKWAY BANK & TRUST COMPANY**, as Trustee under the provisions of a Trust Agreement dated January 19, 2006, and known as Trust #14106

By: **NORTHRIDGE HOLDINGS, LTD.,**
a North Dakota corporation,
its beneficiary

By: _Mueller_
Name: GLENN MUELLER
Title: PRESIDENT

[Signature Page to Third Amendment to Agreement of Purchase and Sale]

EXHIBIT "C"

## FOURTH AMENDMENT TO
## AGREEMENT OF PURCHASE AND SALE

THIS FOURTH AMENDMENT TO AGREEMENT OF PURCHASE AND SALE (this "Fourth Amendment") is dated as of March 22, 2019 (the "Fourth Amendment Effective Date"), and is entered into by and between **NORTHRIDGE HOLDINGS, LTD.**, a North Dakota corporation, and **PARKWAY BANK & TRUST COMPANY**, as Trustee under the provisions of a Trust Agreement dated January 19, 2006, and known as Trust #14106 (collectively, "Seller"), and **WARBURG EQUITIES, LLC**, an Illinois limited liability company ("Purchaser"), which was previously misidentified as a Delaware limited liability company.

## R E C I T A L S:

WHEREAS, Seller and Purchaser entered into that certain Agreement of Purchase and Sale dated January 14, 2019 (as amended by that certain Reinstatement Agreement and First Amendment to Agreement of Purchase and Sale dated January 28, 2019, by that certain Second Amendment to Agreement of Purchase and Sale dated February 6, 2019, and by that certain Reinstatement Agreement and Third Amendment to Agreement of Purchase and Sale dated March 18, 2019, the "Agreement"), for the sale and purchase of the real property located at 561-564 Deere Park Circle in Bartlett, Illinois, as more fully described in the Agreement; and

WHEREAS, Purchaser and Seller desire to amend the Agreement in certain respects as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby amend the Agreement as follows:

1.　　Incorporation of Recitals/Defined Terms. The recitals set forth above are incorporated herein by this reference to the same effect as if the recitals were set forth herein verbatim. All terms not otherwise defined herein shall have the meanings set forth in the Agreement.

2.　　Deposit. Article 2, Section (A) of the Agreement is hereby deleted in its entirety and replaced with the following:

"(A)　Deposit. On or before the Fourth Amendment Effective Date, Purchaser shall wire the sum of ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) (the "Initial Deposit") to Chicago Title Insurance Company in Chicago, Illinois ("Escrowee"). Purchaser and Seller acknowledge that the Initial Deposit has been timely delivered to Escrowee. On or before Tuesday, March 26, 2019, Purchaser shall wire the additional sum of ONE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($150,000.00) (the "Second Deposit") to Escrowee. On or before Tuesday, April 9, 2019, Purchaser shall wire the additional sum of TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00) (the "Third Deposit") to Escrowee. The Initial Deposit, the Second Deposit, and the Third Deposit, together with all interest earned thereon, are collectively referred to herein as the "Deposit." Escrowee shall hold the Deposit in accordance with the terms and conditions of Section 2.2 of this Agreement. For purposes of this Agreement, "Business Day" shall mean any day of the week other than (i) Saturday and Sunday, or (ii) a day on which banking institutions in

Chicago, Illinois is obligated or authorized by law or executive action to be closed to the transaction of normal banking business."

3.    Deposit Provisions.  Sections 2.2(A) and (B) of the Agreement are hereby deleted in their entirety and replaced with the following:

"(A)    Upon either the Closing, Purchaser's failure to timely make the full Second or Third Deposit (with Seller not being in default hereunder), or Purchaser's failure to Close on or before April 29, 2019 (with Seller not being in default hereunder), Escrowee is authorized and directed to pay the Deposit (to the extent received by Escrowee) to Seller or as Seller may direct by the method of payment instructed by Seller.

(B)    Upon receipt of written notice from Seller stating that Seller is entitled under this Agreement to receive the Deposit and demanding payment of the same, Escrowee shall deliver the Deposit (to the extent received by Escrowee) to Seller. Notwithstanding anything to the contrary contained herein, Purchaser acknowledges that Seller is currently entitled to receive the Initial Deposit and Escrowee is authorized and directed to wire transfer the Initial Deposit to Seller pursuant to wire instructions to be provided by Seller."

4.    Amended Agreement.  Except as modified by this Fourth Amendment, the Agreement shall remain unchanged and in full force and effect.  In the event of any inconsistency, conflict, or difference between the terms of the Agreement and the terms of this Fourth Amendment, the terms of this Fourth Amendment shall govern and control.

5.    Severability.  If any provision in this Fourth Amendment shall, for any reason, be held invalid, illegal, or unenforceable in any respect, the invalidity, illegality, or unenforceability shall not affect any other provision of this Fourth Amendment, and this Fourth Amendment shall be construed as if it had never contained the invalid, illegal, or unenforceable provision.

6.    Governing Law.  This Fourth Amendment shall be governed by, and construed under, the internal laws of the State of Illinois.

7.    Counterparts.  This Fourth Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, and when taken together shall constitute the entire agreement between the parties.

8.    Facsimile Signatures.  Signatures to this Fourth Amendment, any amendment hereof and any notice given hereunder, executed and transmitted by facsimile (or by copies of physically signed documents exchanged via email attachments in PDF format or equivalent) shall be valid and effective to bind the party so signing.  Each party agrees to deliver promptly an executed original of this Fourth Amendment with its actual signature to the other party upon request, but a failure to do so shall not affect the enforceability of this Fourth Amendment, it being expressly agreed that each party to this Fourth Amendment shall be bound by its own telecopied or electronically transmitted signature and shall accept the telecopied or electronically transmitted signature of the other party to this Fourth Amendment.

*(signatures on following page)*

**IN WITNESS WHEREOF**, the parties hereto have executed this Fourth Amendment as of the Effective Date.

**SELLER:**

**NORTHRIDGE HOLDINGS, LTD.,**
a North Dakota corporation

By: _____
Name: _____
Title: _____

**PURCHASER:**

**WARBURG EQUITIES, LLC,**
an Illinois limited liability company

By: _____
Name: _____
Title: _____

**PARKWAY BANK & TRUST COMPANY,** as Trustee under the provisions of a Trust Agreement dated January 19, 2006, and known as Trust #14106

By:   **NORTHRIDGE HOLDINGS, LTD.,**
        a North Dakota corporation,
        its beneficiary

        By: _____

                                    Name: _____

_____

                                    Title: _____

_____

[Signature Page to Fourth Amendment to Agreement of Purchase and Sale]

EXHIBIT "D"

# AFFIDAVIT

I, GLENN MUELLER, being first sworn on oath depose and state that, if called to testify, I would be competent to testify, and would testify as follows:

1.  I am over the age of 18 and that I was the Chief Executor Officer, and President of Northridge Holdings LTD as of January 14, 2019 through the initiation of the Receivership Proceedings in the matter of the "United States Securities and Exchange Commission v. Northridge Holdings, Inc. 19 cv-5957" which is presently pending in the United States District Court for the Northern District of Illinois.

2.  On or about January 14, 2019, Northridge Holdings LTD entered into a Agreement of Purchase and Sale with Warburg Equities, LLC for the sale of the real property located at 561-564 Deere Park Circle in Bartlett, Illinois.

3.  Concurrent with the execution of that Agreement, Warburg Equities deposited $100,000.00 with the Chicago Title and Trust Company, which was then acting as Escrowee for this transaction, pursuant to Escrow #18PSA453024XLPJ.

4.  That agreement was amended from time to time, and on March 22, 2019, Northridge Holdings, LLC and Warburg Equities agreed to a Fourth Amendment to that Agreement.

5.  In that Fourth Amendment to the Sales Agreement, Warburg Equities LLC, was to deposit an additional $150,000.00 into Escrow #18PSA453024XLPJ at the Chicago Title and Trust Company.

6.  On or about March 25, 2019, a representative of Warburg Equities LLC advised me that it was unable to deposit the entire $150,000.00 into the escrow as agreed.

7.  At that time, the representative of Warburg Equities LLC requested that Northridge Holdings LTD not declare a default of the contract and that Northridge agree to honor a closing date of April 29, 2019. At that time, Northridge Holdings, LTD agreed to refrain from declaring a default on the Contract, and continue to honor an April 29, 2019 closing dated in exchange for an agreement that Warburg waive the need for a third party Escrow Agent to hold the escrow funds, but rather, consent to the Escrow Agent's release of those funds directly to Northridge Holdings, LTD in order that Northridge Holdings LTD might avoid litigation in the event of further defaults by Warburg Equities, LLC.

8.  The representative from Warburg Equities LLC agreed to those conditions, and on or about March 25, 2019, Warburg Equities LLC directed the Chicago Title and Trust Company to release $100,000.00 from the Escrow #18PSA453024XLPJ, and to wire transfer those funds directly to the Northridge Holdings, LTD account at the Parkway Bank and Trust Company.

9.   Having agreed to those conditions, three days later, on or about March 28, 2019, Warburg Equities LLC directed the Chicago Title and Trust Company to release $100,000.00 from the Escrow #18PSA453024XLPJ, and to wire transfer the remaining $100,000.00 directly to the Northridge Holdings, LTD account at the Parkway Bank and Trust Company.

10.  Northridge Holdings, LTD received the $200,000.00 distribution from the said Chicago and Title Company Escrow #18PSA453024XLPJ, and then used those funds for its own exclusive purposes.

11.  None of those funds were transferred, delivered, or otherwise distributed to American Realty Services, Inc. or Louis Virgilio.


Further affiant sayeth naught.


02/01/2021
————————————
D A T E

————————————————
GLENN   MUELLER


Subscribed and Sworn
to before me this
day of   Feb  , 2021

————————————————
NOTARY PUBLIC


OFFICIAL SEAL
STERLING B PRICE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/20/24

EXHIBIT "E"

**Peca, Wendy**

| | |
|---|---|
| **From:** | wires-noreply@fnf.com |
| **Sent:** | Monday, March 25, 2019 1:21 PM |
| **To:** | Peca, Wendy |
| **Subject:** | WIRED: Outbound Wire Notification for File Number 18PSA453024XLPJ (RGXYYP) {Encrypt} |

# Outbound Wire Notification

for File Number 18PSA453024XLPJ has been WIRED.

## Escrow Information

| | |
|---|---|
| **File Number** | 18PSA453024XLPJ |
| **Closer** | Peca, Wendy |
| **Address** | 561-64 Deere Park Circle, Bartlett, IL 60103 |

## Wire Information

| | |
|---|---|
| **Wire Type** | Escrow |
| **Date Entered** | 03/25/2019 11:54 AM MT |
| **Date Wired** | 03/25/2019 12:21 PM MT |
| **Status** | WIRED |
| **Fed Number** | 002940 |
| **Sequence Number** | 30757 |
| **Approved By** | Petrusha, Mary |
| **Confirmed By** | Lopez, Mareigha |
| **Rejected By** | |
| **Additional Info** | EM for Deere Park |
| **Comments** | Batch ID: 098, Message: Batch ID: 098 |
| **Source System** | SPS.IL |

## Bank Information

| | |
|---|---|
| **Originating Account** | 130120277020 |
| **Amount** | $100,000.00 |
| **Receiving Bank ABA#** | 071908160 |
| **Receiving Bank** | PARKWAY BANK AND TRUST CO |
| **Final Credit Bank** | |
| **Final Bank Account** | |

## Lender Information

| | |
|---|---|
| **Lender Name** | Parkway Bank and Trust Company, as Trustee under |
| **Address** | |
| **Lender's Account** | 382620 |
| **P/O Loan Name** | |
| **P/O Loan #** | |

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

EXHIBIT "F"

**Peca, Wendy**

| | |
|---|---|
| **From:** | wires-noreply@fnf.com |
| **Sent:** | Thursday, March 28, 2019 4:36 PM |
| **To:** | Peca, Wendy |
| **Subject:** | WIRED: Outbound Wire Notification for File Number 18PSA453024XLPJ (JJ3G70) {Encrypt} |

# Outbound Wire Notification

for File Number 18PSA453024XLPJ has been WIRED.

### Escrow Information

| | |
|---|---|
| **File Number** | 18PSA453024XLPJ |
| **Closer** | Peca, Wendy |
| **Address** | 561-64 Deere Park Circle, Bartlett, IL 60103 |

### Wire Information

| | |
|---|---|
| **Wire Type** | Escrow |
| **Date Entered** | 03/28/2019 03:17 PM MT |
| **Date Wired** | 03/28/2019 03:35 PM MT |
| **Status** | WIRED |
| **Fed Number** | 004248 |
| **Sequence Number** | 45847 |
| **Approved By** | Petrusha, Mary |
| **Confirmed By** | Ponce, Carolina |
| **Rejected By** | |
| **Additional Info** | EM 2 |
| **Comments** | Batch ID: 161, Message: Batch ID: 161 |
| **Source System** | SPS.IL |

### Bank Information

| | |
|---|---|
| **Originating Account** | 130120277020 |
| **Amount** | $100,000.00 |
| **Receiving Bank ABA#** | 071908160 |
| **Receiving Bank** | PARKWAY BANK AND TRUST CO |
| **Final Credit Bank** | |
| **Final Bank Account** | |

### Lender Information

| | |
|---|---|
| **Lender Name** | Northridge Holdings, Ltd |
| **Address** | |
| **Lender's Account** | 382620 |
| **P/O Loan Name** | |
| **P/O Loan #** | |

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

## **EXHIBIT 2**

**Promissory Note**

# LOU VIRGILIO
## 1809 S. LINDEN AVENUE
## PARK RIDGE, IL 60068

PROMISSORY NOTE – Supersedes all previous notes and includes loans of
7/10/2017 $20,000.00, 10/16/2017 $20,000.00, 1/24/2018 $20,000.00, 3/1/2018
$30,000.00, 12/28/2018 $15,000.00, 01/16/2019 $10,000.00.

$115,000.00                                    January 16, 2019

City of  Park Ridge                            State of Illinois

    Per agreed upon after date, without grace, I promise to pay to the order of Northridge Holdings, Ltd. the sum of One Hundred Fifteen Thousand and 00/100 dollars ($115,000.00) for value received, with interest at the rate of  0  percent per annum from date until maturity, interest payable  0  and if not so paid, the whole of this note, both principal and interest, shall forthwith become due and payable upon demand, at the option of the holder.  After maturity, or default, this note bears interest at the rate of  0  per cent per annum until paid.  Principal and interest payable in lawful money of the United States.  In case suit or action is commenced to collect this note or any portion thereof, I promise to pay, in addition to the costs provided by statue, such as the court may adjudge reasonable attorney's fees therein, and any judgement entered hereon shall bear interest at the rate of  0  per cent per annum.  This note is personally guaranteed by  Lou Virgilio.

DUE  December 27, 2019, at 1020 W. Fullerton Ave, Suite G, Addison, IL  60101

Signature of maker – Lou Virgilio            witness to Lou Virgilio's signature

   Lou Virgilio
Lender's name

  1809 S. Linden Avenue                    773-744-8444
Mailing address                              Telephone Number

  Park Ridge, IL  60068                     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
City            State        Zip Code         Social Security Number

**<u>EXHIBIT 3</u>**

**Proposed Order**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES** | ) | |
| **AND EXCHANGE COMMISSION,** | ) | **Civil Action No. 19-cv-05957** |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Hon. John Z. Lee** |
| | ) | |
| **NORTHRIDGE HOLDINGS, LTD., ET AL.,** | ) | |
| | ) | **Magistrate Judge Susan E. Cox** |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

## <u>ORDER DISALLOWING CLAIM</u>

Upon consideration of the *Receiver's Objection to Claim of American Realty Services, Inc. (Claim No. 23)* (the "<u>Claim Objection</u>") [1] [Dkt. ____], any responses to the Claim Objection, and any reply in support of the Claim Objection, this Court finds that: the relief requested in the Claim Objection is in the best interests of the Receivership Estate, claimants, and all other parties; the Court having further found that notice of the Claim Objection was good and sufficient under the particular circumstances and that no other or further notice need be given; and based upon the record herein and after due deliberation, it is hereby **ORDERED THAT**:

1.      The relief requested in the Claim Objection is GRANTED.

2.      The claim of American Realty Services, Inc. (Claim No. 23) shall be disallowed in its entirety.

3.      The Receiver is authorized to take all actions necessary to effectuate the relief granted in this Order.

---

[1]   Capitalized terms not herein defined shall have the meaning ascribed to them in the Claim Objection.

4.        The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated this _____ day of _____, _____.
Chicago, Illinois

_____
Honorable Ronald A. Guzman